**Scott J. FROST, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 14–97–00967–CR.**

Court of Appeals of Texas,
Houston (14th Dist.).

Aug. 31, 1999.

Cathleen C. Herasimchuk, Rusty Hardin, Houston, for appellant.

Panel consists of Justices HUDSON, EDELMAN, and WITTIG.

### MAJORITY OPINION

J. HARVEY HUDSON, Justice.

Dr. Scott Frost, appellant, was charged by information with the misdemeanor offense of making a false report. *See* Tex. Pen.Code Ann. § 42.06 (Vernon 1994). Appellant entered a plea of not guilty. After considering the evidence, a jury convicted appellant, and the court subsequently assessed his punishment at 90 days confinement in the Harris County Jail and a $350.00 fine. The court suspended the sentence, however, and placed appellant under the terms and conditions of community supervision for one year. On appeal, Dr. Frost contends his conviction should be reversed because (1) the jury's verdict is not supported by sufficient evidence and (2) he was charged under the wrong statute. We affirm.

The record reflects that in April of 1995, Allen and Valerie Cecil lived in a small suburban subdivision in northwest Harris County. Mrs. Cecil had two small children, a two-and-one-half-year old boy and a six-month old daughter. Because of their young age, the children were not permitted to play in the front yard, but Mrs. Cecil would occasionally allow her son to accompany her to the front mail box. One annoying aspect of these short walks was the presence of dog excrement on the front lawn.

Appellant lived a short distance from the Cecils and owned two dogs. Mrs. Cecil had observed appellant and his wife walking their dogs and had seen the dogs urinating and defecating on her front lawn. Although irritated by this activity, Mrs. Cecil said nothing. However, the April edition of the neighborhood newsletter contained a large article which focused on

the problem of dog and pet excrement in the neighborhood.

Shortly after midnight, on April 18, 1995, Mrs. Cecil, tending to her infant daughter, observed appellant and his wife coming down the street with their two dogs. One dog was in a neighbor's lawn across the street. The other dog was urinating on the Cecil's mailbox. Tired and angry, Mrs. Cecil proceeded downstairs to have a word with appellant and his wife. By the time she got out to the street, appellant was some distance away, but his wife was still nearby. Mrs. Cecil pointedly chastised her for permitting the dogs to soil neighborhood lawns. Mrs. Cecil explained she was particularly distressed because her son might conceivably step or fall in the feces. Mrs. Cecil was further annoyed by the fact this conduct continued even after it was the subject of an article in the neighborhood newsletter. She bluntly advised Ms. Frost that the practice was unacceptable, and that if she saw them doing it again, she would report them to the neighborhood association.

Ms. Frost was apparently shaken by the encounter. At approximately 8:30 a.m., she called Marcia Evans, another neighborhood resident, to complain about the early morning incident. She was very upset and asked how she might file a complaint against Mrs. Cecil with the neighborhood association. Ms. Evans explained to Ms. Frost that there was no official neighborhood association, but that she could possibly contact the subdivision developer or sales representative.

Approximately ninety minutes later, Dr. Frost called Child Protective Services and reported that he had seen two children living at the Cecil's address, a three-year old girl and an eighteen-month old boy, who regularly played in the street while unsupervised. He also reported that the last time he had witnessed these children playing in the street was three days earlier

on April 15, 1995. Appellant stated that because he was a neighbor, he did not want the children's mother to know who had made the report.

Because of the dangerous nature of the reported activity, the call was classified as a "priority one" complaint, and an investigator was dispatched to check on the situation. At approximately 12:30 p.m., the case worker arrived at Mrs. Cecil's front door and advised her that she had been accused of endangering her children by permitting them to play in the street. Mrs. Cecil, horrified, asked the case worker if she was sure she had the correct address. The case worker confirmed the address, and Mrs. Cecil invited her inside. The case worker proceeded to explain the nature of the complaint and examined both of Mrs. Cecil's children as well as her home. Mrs. Cecil explained that her son was too small to get outside by himself and that her daughter could not yet crawl. The case worker then asked Mrs. Cecil about April 15, 1995, a day when the caller specifically said he had seen her children in the street.

Mrs. Cecil explained that on April 15, 1995, the residents of the subdivision had conducted an Easter egg hunt and "pot luck" dinner on her street which was a cul-de-sac. To ensure the safety of their children, barricades and signs were erected, closing the entrance to all motor vehicle traffic other than residents. Beginning at approximately 4:00 p.m., children and adults filled the street hunting for eggs and later gathering for dinner. On several occasions the barricades were moved to permit a vehicle to pass down the street when necessary.[1] In each instance, lawn chairs and tables were moved and the children herded onto adjacent lawns to permit a safe passage. However, the street was closed to normal vehicular traffic and the children were accompanied by

---

1. One of the persons who sought, and was permitted, to drive past the barricade that day    was the appellant.

at least fifty adults. The Cecils attended the festivities and volunteered their lawn as one of sites for the Easter egg hunt. Her son participated in the hunt, and was supervised by his father, grandmother, and two adult stepsisters.

When Child Protective Services asked for references, Mr. and Mrs. Cecil consented to have case workers contact any of their neighbors. Moreover, the Cecils provided the case worker with the names and telephone numbers of other persons who lived on their street. After interviewing some of the neighbors and conducting a thorough investigation, the agency concluded there was no basis for the report.

■ In his first point of error, appellant contends the evidence was legally and factually insufficient to support the jury's verdict. Specifically, Frost contends there is no evidence he initiated a false report that two children were playing in the street unsupervised. Frost further contends that even if the report was false, he filed the report with good intentions.

■ When assessing the legal sufficiency of the evidence to support a conviction, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Moreover, the reviewing court is not to position itself as a thirteenth juror in assessing the evidence. *See Penton v. State,* 799 S.W.2d 364, 366 (Tex.App.-Houston [14 th Dist.] 1990, no pet.). Rather, it is to position itself as a final, due process safeguard ensuring only the rationality of the factfinder. *See Moreno v. State,* 755 S.W.2d 866, 867 (Tex.Crim.App.1988). Once the trier of fact has assessed and weighed the probative value of the evidence, an appellate court must not dissect

the evidence into its individual components for the purpose of reevaluating the integrity, credibility, or persuasiveness of distinct items of evidence. *See Fernandez v. State,* 805 S.W.2d 451, 456 (Tex.Crim.App.1991). This, the trier of fact has already done. *See Moreno,* 755 S.W.2d at 867. An appellate court has only the discretion to determine if *any* rational trier of fact could have logically found the essential elements of the offense beyond a reasonable doubt. *See Rodriguez v. State,* 819 S.W.2d 871, 873 (Tex.Crim.App.1991).

The charging instrument states that appellant did, on April 18, 1995, "knowingly initiate a report of a past emergency, namely two children playing in the street unsupervised ... that he [knew was] false." Appellant now concedes that Mrs. Cecil's children were not playing in the street.[2] As the dissent points out, it could be argued that Dr. Frost perhaps saw two *other* children playing in the street unsupervised. This possibility is bolstered by appellant's description of the children, *i.e.,* he reported seeing a three-year old girl and an eighteen-month old boy in the street while the Cecils had a two-and-one-half-year old boy and a six-month old girl. Thus, the dissent concludes the State's evidence is insufficient to support a conviction for false report *as alleged in the information.*

Several facts persuasively refute this contention. First, appellant reported to Child Protective Services that virtually every time he arrived home before dark, he saw the two children playing in the street. From this, he surmised the children played in the street "every day." Thus, this was not an isolated incident, but an activity with which appellant claimed to be familiar. Second, appellant reported that while the children were usually unsupervised, he had seen the mother with the children on several occasions. In other words, these were not just *any* children, they belonged to Mrs. Cecil. Third, although he did not

**2.** Appellant's brief states: "It is undisputed that the children, if any, that Dr. Frost saw were not those belonging to Ms. Cecil."

know the family's name, appellant specifically identified the Cecil's address as the children's home. Fourth, appellant had a motive for making a false report because Mrs. Cecil had verbally accosted his wife earlier that day. In fact, appellant's wife had searched for some means to file a complaint with the neighborhood association. Fifth, appellant specifically requested that Children's Protective Services not reveal his identity to the mother. While a legitimate, good faith, repartee might prefer that his identity not be disclosed, anonymity is even more important where the reportee is knowingly making a false report. Moreover, appellant requested his identity be shielded not from the parents or family, but *from the mother*, who seems again to have been the focus of his attention.

Finally, and perhaps most significantly, appellant's defensive theory on appeal is not consistent with the one he raised at trial. Once it became clear during trial that Mrs. Cecil's oldest child was a boy, appellant began to refer to the child he had seen in the street as a boy. Although confused about the child's gender at first, appellant testified that he almost struck the oldest child with his automobile approximately six weeks before calling Child Protective Services. Appellant said he was forced to make a panic stop to avoid hitting the child:

A.    ... I tried to figure out where this child came from or who *he* was—I had never—I could not say I had seen *it* before, the little one was retrieved from the sidewalk to the front door and that's when *she—he* went in.

Q.    Was that the Cecil home?

A.    I now know it to be the Cecil home but I did not know who she was for another year after that.

(Emphasis added).

Thus, the defense presented to the jury was *not a misidentification of the Cecil* children. Rather, the defensive theory was that, due to his work as an orthopedic surgeon, appellant had become hypersensitive to dangers faced by small children. Accordingly, he was more likely than most to see the Easter egg hunt as imperiling the safety of the children. In fact, he described the neighborhood party as a "poltergeist chaos nightmare of children running everywhere." Dr. Frost testified no barricades were in place, lots of children were in the street, and no adults were visibly present.[3] Appellant also testified that among the children he saw that day was the "little boy" that he had almost hit six weeks earlier, standing in front of the Cecil house.

Ironically, it was the State who suggested on cross-examination that appellant could not logically deduce with absolute certainty that the boy he almost hit lived in the Cecil home. Appellant admitted this was so, but then went on to describe the child with greater particularity and said he had straight dark hair. Moreover, the Cecil boy was apparently the only child in the neighborhood who fit this description. Appellant said:

A.    It's the only one with straight dark hair in the neighborhood. All the rest of them are redheads, blondes . . .

Q.    The only child with dark hair in the neighborhood?

A.    That I've seen.

Thus, appellant identified the child as belonging to the Cecil household by (1) his disappearance into the house, (2) his standing in the street in front of the house during the Easter egg hunt, and (3) his distinctive straight dark hair. Accordingly, it was never seriously disputed that the child appellant claims to have seen in the street was Mrs. Cecil's son.

---

**3.**  Appellant's description was contradicted by several neighbors who attended the party as well as photographs of the festivities. When confronted with their testimony, appellant said the neighbors had lied.

■ The dissent concludes the aforementioned circumstances will only support inferences, but no ultimate conclusion. However, it is the obligation of the factfinder to resolve conflicts in the testimony, to weigh the evidence, and to draw *reasonable inferences* from basic facts to ultimate facts. *See Jackson*, 443 U.S. at 318–19, 99 S.Ct. 2781; *Van Guilder v. State*, 709 S.W.2d 178, 179 (Tex.Crim.App.1985); *Revell v. State*, 885 S.W.2d 206, 208 (Tex. App.-Dallas 1994, pet. ref'd). In fact, participation in a criminal offense may be inferred entirely from the circumstances. *See Miranda v. State*, 813 S.W.2d 724, 732 (Tex.App.-San Antonio 1991, pet. ref'd).

Of particular importance in this case is the evidence suggesting appellant possessed a motive to humiliate Mrs. Cecil. Appellant denied any such motive, of course. In fact, he testified he did not know his wife had argued with Mrs. Cecil. Appellant claims his wife told him a lady had complained about their dogs, but she did not identify the woman. Appellant added that many people in the neighborhood had complained about his dogs and that "it wasn't that big of a deal to me." The jury evidently concluded appellant was lying.

Nevertheless, the dissent concludes that evidence of motive is not sufficient to establish a false report, citing *Wood v. State*, 577 S.W.2d 477 (Tex.Crim.App.1978). In *Wood*, the court analyzed the circumstantial evidence of motive and held that it failed to exclude "every other reasonable hypothesis" than guilt. *Id.* at 480. That case was decided, however, at a time when circumstantial evidence was considered to be decidedly inferior to direct evidence. Circumstantial evidence, like motive, was analyzed under the "reasonable hypothesis analytical construct." *See Geesa v. State*, 820 S.W.2d 154, 155 (Tex.Crim.App.1991). If the circumstances would support any reasonable hypothesis other than guilt, the evidence was considered insufficient as a matter of law. Thus, rather than asking if a rational jury could reasonably find the

defendant guilty, the test in cases of circumstantial evidence was whether a rational jury could have reasonably found the defendant not guilty. If so, the evidence was insufficient.

Five years after *Wood* was decided, the Court of Criminal Appeals announced that "direct and circumstantial evidence are equally probative." *Hankins v. State*, 646 S.W.2d 191, 199 (Tex.Crim.App.1981). Further, in 1991, the court abandoned the "reasonable hypothesis analytical construct," concluding it is inconsistent with the "reasonable doubt" standard set forth in *Jackson v. Virginia*. *See Geesa*, 820 S.W.2d at 155. Accordingly, the supporting rationale in *Wood* has been overruled and the decision has no precedential value.

It is not the duty of this court to disregard, realign, or weigh the evidence. *See Bonilla v. State*, 933 S.W.2d 538, 540 (Tex. App.-Houston [1st Dist.] 1995, no pet.). Because the jury was in the best position to consider all the evidence first hand, and to view the demeanor and expression of the witnesses, the verdict must stand unless it is irrational or unsupported by more than a mere modicum of evidence. *See Morales v. State*, 828 S.W.2d 261, 263 (Tex. App.-Amarillo 1992), *aff'd*, 853 S.W.2d 583 (Tex.Crim.App.1993). "Reading a cold record without the benefit of observing the physical and emotional responses, if any, of live witnesses is one of the major factors, if not *the* major factor, as to why the standard for a reviewing court bases an examination of the evidence 'in the light most favorable to the verdict.'" *Wiley v. State*, 820 S.W.2d 401, 404 (Tex.App.-Beaumont 1991, no pet.).

■ Proof of the defendant's mental state must, by necessity, almost always depend upon circumstantial evidence. *Sadler v. State*, 728 S.W.2d 829, 831 (Tex. App.-Dallas 1987, no pet.). Here, the sequence of events suggest appellant's call to Child Protective Services was motivated solely by a desire to embarrass Mrs. Ce-

cil.[4] Thus, a rational jury could reasonably conclude from the evidence presented here that appellant did not see two children playing in the street unsupervised and that his statement to the contrary was a complete and utter fabrication. Appellant's first point of error is overruled.

■ In point of error two, appellant contends for the first time on appeal that the doctrine of *in pari materia* required he be charged under the Family Code section that deals specifically with filing a false report concerning child abuse or neglect, not the more general Penal Code provision.[5] Frost claims that because he was charged under a statute with a greater penalty, we must reverse with instructions to dismiss. Frost, however, did not attack the indictment at the trial level. As a result, Frost has not preserved this point of error for appellate review. *See Milligan v. State*, 859 S.W.2d 117, 119 (Tex. App.-Eastland 1993, pet. ref'd); Tex.Code Crim. Proc. Ann. Art. 1.14 (Vernon Supp. 1999); Tex.R.App. P. 33.1(a).

Accordingly, appellant's second point of error is overruled, and the judgment of the trial court is affirmed.

DON WITTIG, Justice, dissenting.

My erudite and eloquent brothers paint the piqued prosecutrix proud! It seems to me the harried complainant, roared down her midnight staircase in a rage. She lit into the meek mannered appellant's wife with a vengeance, aggravated by the sight and smell of fresh animal stuff. Based on the circumstantial evidence [1] here adduced, I think we should call this the case of the yellow mail box.

Both the Government and the majority seemed obsessed with the plight of this worthy young mother whose unabashed anger and detest for the natural instincts of the homely kitty cat and the noble dog appear unparalleled in the law. So extreme was her angst, that she turned her sights of the good offices of the District Attorney, knocking and knocking on the door, ad nauseam. Repeatedly, she insisted her neighbor at the other end of the block be charged with criminal conduct, wanting not only blood but jail time. It reminds me of the fabled wolf, who persistently huffed and puffed 'til he blew the first two houses down.[2] The aggrieved agency, CPS, saw no need to prosecute. Indeed, this type of case had never been brought (nor should it have been.) This unique case arose only when one enraged neighbor insisted her neighbor be charged, prosecuted, convicted, sentenced to jail time, and now forced to appeal this astonishing debacle.

Lawsuit abuse does not begin to describe the abomination of allowing one citizen to wreak public retribution, one upon another, neighbor upon neighbor. Now not only must physicians and any citizen fear a civil lawsuit, they must not report a

---

4. "And though it hath pleased God to reserve the art of reading men's thoughts to himself: yet, as the fruit tells the name of the tree; so do the outward works of men (so far as their cogitations are acted) give us whereof to guess at the rest." Sir Walter Raleigh, *Preface to the History of the World, in* The Harvard Classics 68 (Charles W. Eliot ed., 1969).

5. At the time of this offense, Section 34.031 of the Family Code made it a Class B misdemeanor offense for a person to intentionally or knowingly make a report of abuse or neglect of a child which the person knew lacked any factual foundation. See Act of June 1, 1987, 70th Leg., R.S., ch. 1052, § 6.07, 1987 Tex. Gen. Laws 3574, *repealed by* Act of April

6, 1995, 74th Leg., R.S., ch. 20, § 2, 1995 Tex. Gen. Laws 282.

1. Both the majority and prosecution rely heavily on circumstantial evidence though there is often direct evidence, as here, that the mail box was soiled. The problem I have is not with modernity's affinity for circumstantial proof, but as later discussed, piling inference on inference. Here there is no dispute about the yellow mail box, only the sequela, and the sequela of the sequela.

2. The ending of the three little pigs story is different here. Unfortunately, in the story of the yellow mailbox, even the stone house of the law is, I believe, shaken.

child in the street for fear of criminal reprisals.[3] What happened? Or more material, what proof have we of that fretful, fateful night of the yellow mailbox?

Appellant, Scot J. Frost, pled not guilty before a jury to the misdemeanor offense of making a false report. *See* TEX. PEN. CODE ANN. § 42.06 (Vernon 1994). After conviction, the jury assessed punishment at ninety days confinement in the Harris County Jail probated for one year and a $350 fine. Appellant asserts two points of error. First, he challenges the legal and factual sufficiency of the evidence to support his conviction. Secondly, he asserts the doctrine of *in pari materia* required that he be charged under the Texas Family Code and not the Texas Penal Code. While appellant's second challenge may be correct, it seems to have been waived, probably because the prosecution filed, dismissed, then refiled under the different statutes, hardly giving appellant a chance to complain. As to the cardinal and primal point, I would sustain, and accordingly reverse and render the judgment below.

## Background

Around 10 a.m. on April 18, 1995, appellant, according to the testimony, called Child Protective Services (CPS) and reported that a three-year old *girl* and an eighteen-month old *boy* in his neighborhood played in the street unsupervised. Not only does the majority ignore this undisputed fact, but also seek to rewrite not only the report summary which is the basis of the charge but also opines that appellant's testimony can somehow (circumstantially?) alter the information charging appellant. In other words, the majority changes not only the prosecution's theory but also changes the charges against appellant to meet the circum-

**3.** See also FN 4 and FN 9, infra. I also note TEX. FAM.CODE ANN. § 261.01(a)(b), § 261.103 (Vernon Supp.1999). requires both lay individuals and every licensed professional to report any belief that a child has been neglected or abused to the CPS or other law enforcement agency. The identity of the person making a

stances in trial. Appellant stated that the most recent occasion of street play occurred on April 15, 1998. Appellant did not know the names of the parents or the children, but did identify the house at the end of his cul de sac, on Almahurst.

CPS, in its sole discretion, assigned a priority one to appellant's report indicating that a CPS worker should investigate it within twenty-four hours. CPS's investigation revealed no finding of neglect or negligent supervision at the address. Nor, however, did they conclude the report itself was false.

## Analysis

The majority correctly states appellant's issue in which he contends the State's evidence was legally and factually insufficient to establish the allegations of the *information*. The information charged Appellant with making a false report in the following language:

> ... Defendant, on or about April 18, 1995, did then and there unlawfully knowingly initiate a report of a past emergency, namely *two children playing in the street unsupervised* to Erin Hollis, Children Protective Service[,] that he knows is false and that would ordinarily cause action by a official agency organized to deal with emergencies, to wit: go out and investigate this report of negligent supervision.

(emphasis added). Appellant correctly challenges the State's case concerning the italicized portion of the information. He argues that the State was required to prove that allegation beyond a reasonable doubt because it amounted to the description, stating what part of his report purportedly and specifically was false.

report is confidential and may only be disclosed by court order or to law enforcement. *Id* § (d). This law was apparently ignored by CPS and the majority opinion effectively emasculates the legislatures' clear expression of confidentiality under this reporting statute.

If the State's proof falls short of the allegations, reversal of a conviction due to insufficient evidence may result. *See Wray v. State,* 711 S.W.2d 631, 633 (Tex. Crim.App.1986) (en banc); *Rogers v. State,* 756 S.W.2d 332, 335 (Tex.App.—Houston [14th Dist.] 1988, pet. ref'd). However, proof is not requisite for superfluities, "[u]nnecessary words or allegations in an indictment [or information] may be rejected as surplusage if they are not descriptive of that which is legally essential to the validity of the indictment." *Wray,* 711 S.W.2d at 633. If the additional language describes an essential element of the offense charged, then the State must prove that language in addition to the statutory elements of the offense, beyond a reasonable doubt. *Id.*

In this case the State must prove beyond a reasonable doubt that:(1) appellant; (2) knowingly; (3) initiated a false report; (4) of a past emergency; (5) that he knew was false; and (6) that would ordinarily cause an action by an official or agency organized to deal with emergencies. *See* TEX. PEN.CODE ANN. § 42.06 (Vernon 1994).

Reporting a statement that one *knows is false or baseless* is an essential element of the offense of a false report. *Id.*; *see Watts v. State,* 706 S.W.2d 707, 707 (Tex. App.—Corpus Christi 1986, pet. ref'd). Here, the State did not specify, by name or address, the alleged false statement, limiting it to only include the complainant's children. Rather the State used a general allegation to describe the alleged false statement. The State alleged that Appellant's false statement was that "two children [were] playing in the street unsupervised." Because the allegation described the false statement, an essential element of the offense, the State must carry the burden to prove that allegation beyond a reasonable doubt. *See Wray,* 711 S.W.2d at 633; *Rogers,* 756 S.W.2d at 335. The majority tries to avoid this necessary proof by erroneously attempting to change, by judi-

cial fiat, both the information and the alleged false statement. This court is charged by the law to determine whether the State met its burden of proof. *See Horne v. State,* 749 S.W.2d 74, 76 (Tex. Crim.App.1988) (en banc). This the majority avoids by trying to change the information and alleged false report.

When reviewing the legal sufficiency of the evidence, we look at the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Mason v. State,* 905 S.W.2d 570, 574 (Tex.Crim.App.1995). The trier of fact is the exclusive judge of the credibility of witnesses and of the weight to be given their testimony. *See Jones v. State,* 944 S.W.2d 642, 647 (Tex.Crim.App.1996). Likewise, reconciliation of conflicts in the evidence is within the exclusive province of the fact finder. *Id.* This standard of review is the same for both direct and circumstantial evidence cases. *See Chambers v. State,* 711 S.W.2d 240, 245 (Tex.Crim. App.1986). In addition, this standard applies to the review of evidence when challenging descriptive allegations in the indictment or information. *See Horne,* 749 S.W.2d at 76.

The State was required to prove beyond a reasonable doubt that Appellant's statement was false or, in other words, that there were *not* two children playing in the street unsupervised. The State established that Appellant and his wife were walking their dogs a little after midnight on the morning of April 18, 1996. Peering through the window of her house, complainant spied appellant and his dog. While in front of her house, appellant's dog, apparently struck by a call of nature, stopped and watered complainant's very own mailbox.[4] Complainant, flabbergasted

---

4. It is thus undisputed that the subject of this case (or object) is the yellow mailbox. Both

the majority and prosecution would have the reader color it otherwise. Accordingly the

by appellant's failure to forbid, intervene, or prevent such despicable conduct, instanter stopped breast feeding her six-month old, and marched onto the early morning, (about 12:30 a. m.) dark, battleground scene. By the time complainant made it to her front yard, appellant had safely returned to his home. Unfortunately his wife and her dog were now in front of complainant's house. Upon this critical point, the majorities' entire house of cards rest. The complainant, admittedly rude, told appellant's wife what she thought of appellant's and his dog's conduct and informed appellant's wife she would be reported to the neighborhood association if it happened again. The State also entered evidence that appellant's wife called another neighbor and stated she wished she could report complainant's conduct. No such evidence is attributable to appellant, not even circumstantially.

Neither we, nor the jury had the benefit of what appellant actually reported to CPS.[5] CPS destroyed the actual report, the verbatim tape recording of this supposedly confidential complaint. The CPS's abbreviated summary sketched the fifteen minute conversation into a few sentences indicating that two children were playing in the street unsupervised. Internally inconsistent, the summary of the actual report both stated that this inappropriate child's play occurred daily and at the same time reported only one or two actual incidences because appellant went to work early and returned late, *rarely seeing the children*. The last time appellant observed the unsupervised street play was on April 15. He described the two children as a three-year old *girl* and an eighteen-month old *boy* and reported the house on Almahurst. At trial, complainant testified contrary to this description of the children indicating that her *son* was two-and-a-half years old and her *daughter* was six months old in April of 1996. All agreed the infant, en fans, did not play in the street. Complainant as well as two neighbors testified that *her* children were never allowed to play in the street, especially unsupervised. The evidence also established that the neighborhood had an Easter egg hunt on April 15, the same day Appellant reported he had observed the unsupervised street play, and that *numerous* neighborhood *children* (including the older Cecil child) *undisputedly played in the street that day*. One State's witness testified to as many as thirty-five children were at play in the street. And at least *some of the parents were not present to supervise* their own children. These facts, the majority also chooses to ignore. The majorities proof instead, is inference upon inference.

The State failed to enter and the majority does not point to any evidence establishing that there were not two children in the street playing unsupervised. The evidence merely establishes that complainant's children were not in the street. Further, the evidence demonstrates appellant's description, by age and sex, of the two children was not a description of complainant's children. The State's allegation was not that appellant falsely reported *complainant's children* were in the street but that *two children* were in the street.[6]

principal person with an obvious motive, is the prosecutrix. The majority turns the confidentiality accorded by law of CPS's work into a nefarious motive of appellant and contemporaneously ignore his stated chief concern, the safety of the children. This confidentiality lawfully afforded appellant was broken by complainant's groundless and frivolous lawsuit against CPS, who paid tribute to her by releasing this confidential informant information thus endangering the liberty and reputation of appellant.

5. The majority glibly ignores the lost report. They would argue, I surmise, that an abbreviated summary, like the fruit under a tree, can tell us the size, shape, foliage and crown dimensions, indeed even the criminal intent of the woody plant.

6. Again the majority criticizes the dissent because I point out that other children could have been in the street. The majority ignores that *the prosecution*, not the dissent, theorized that Appellant's could have been mistaken about the age and sex of the children. It is

The State and majority argue that the confrontation between complainant and appellant's wife establishes a motive. I recognize that in certain cases circumstantial evidence is sufficient to prove intent. *See, e.g., Moss v. State*, 850 S.W.2d 788, 796–97 (Tex.App.—Houston [14th Dist.] 1993, pet. ref'd) (proving intent to deliver a controlled substance with circumstantial evidence). However, in *Wood v. State*, the Texas Court of Criminal Appeals examined whether motive was sufficient to establish a false report. The State charged Wood with making a false report to a police officer by stating that the officer was intoxicated when he issued her a citation. 577 S.W.2d 477, 478 (Tex.Crim.App.1978).[7] The evidence revealed a slight confrontation between Wood and the officer in which Wood called the officer a "bastard" and stated she would not pay the ticket. *Id.* Later that day, Wood contacted the police department and reported that the officer was intoxicated. *Id.* Viewing the evidence in the light most favorable to the conviction, the court recognized that the evidence established that the officer was not intoxicated and that Wood had ample opportunity to perceive this. *Id.* at 480. Despite this and the possible motive for Wood to fabricate a false report against this particular officer, the court held that the State's evidence was insufficient to establish that Wood *actually knew* that the officer was not intoxicated. *Id.*

At least in *Wood*, there was a *direct confrontation*. Significantly, because appellant had *no direct involvement* with complainant, the majority's motive argument is tenuously based on the inference that appellant's wife took umbrage from the complainant's verbal assault. Then, concluding that because the wife had a potential spite motive, therefore, the majority divines[8] this defendant Orthopedic Surgeon also had a spite motive. On the infamous 18th of April, appellant first learned a young boy's leg had to be amputated, the result of an auto/child accident. Appellant's several years of care in an attempt to save this young fellow's leg went for naught. The doctor claimed this amputation incident prompted his call to CPS. While the State certainly need not disprove this assertion by the defense, the State's stacking of inference upon inference hardly satisfies its burden to prove appellant actually knew his statement was false. See *Wood*, 557 S.W.2d at 480; *Cf. $9,050.00 in United States Currency v.*

interesting to me how the majority picks and chooses what part of the State's theory they will promote to fact, and what part they choose to ignore. And if we accept the majorities position, then citizens can be prosecuted and convicted of making a false report if one misidentifies the sex or age of an auto accident victim or gives the wrong address of a fire.

7. I do not dispute the later collateral authority cited by the majority which perhaps weakens the underpinnings of *Wood*. Am I wrong not to " move an ancient landmark set up by your fathers." See Proverbs 22:28. More materially, the majority sites no authority for its position that a decent law abiding citizen of this State can be criminally convicted based solely on one wobbly inference toddling upon another.

8. The majority at once heralds the praises of circumstantial evidence (only God can read man's thoughts) then based on "the sequence of events" conjures appellant's call to CPS as motivated "solely by a desire to embarrass Mrs. Cecil." Trouble is, appellant was at the office when his wife complained to the neighbor later that morning. Nor was he there at the fateful confrontation between his wife and the complainant. I suppose the majority assumes (perhaps circumstantially) every spouse knows what the other is thinking, which is equally probable with the majorities' circumstantial inference that no children ever play in any street, any time unsupervised, even, as here, when their parents are off somewhere else cooking! Similarly, if one spouse acts 90 minutes later, one from home and one from the office, these events are, according to the majority, not only causally related, but proof of criminal intent! The majority adopts as law one of the most ancient fallacies of logic: after the fact, therefore because of the fact. I fear we have injected the law unwittingly into a vicious personal and lawsuit dispute and simply taken sides with the louder voice. Even CPS "was really shocked" by the prosecution when in five years they "never heard of it (prosecution)"

*State,* 874 S.W.2d 158, 162 (Tex.App.— Houston [14 th Dist.] 1994, writ denied) ("... it is well established that an inference of fact cannot be based upon another inference of fact.")

Taking all the evidence in the light most favorable to the verdict, the State perhaps proved that complaint's children were not playing unsupervised in the street. Sadly, that is not what appellant was charged with. The State's evidence however, was insufficient to demonstrate that there were not two children playing in the street who appellant, not anyone else, perceived to be unsupervised. Accordingly, I would sustain appellant's first issue.[9]

As cavalier as the majority presents on the matter of appellant's knowingly initiating a false report, by their silence they would seduce us to believe the neighborhood picnic presented "a past emergency." Recall the bucolic description of this peaceful scene as depicted by the majority, barricaded streets, lawn chairs and festivities. So assuming the worst, let us strain to imagine some children, somewhere, sometime, played alone on a cul de sac street unsupervised. This, standing alone, is not the type of yelling-fire-in-the-crowded-theater that amounts to a past emergency as contemplated by the Penal Code. Surely CPS treated the matter seriously, as they should. But any analysis will demonstrate that "playing" is not an emergency, "alone" is not an emergency and "unsupervised" is not an emergency. While the statute does not define emergency, it specifically proscribes "bombing," "fire," and "offense" reports. See TEX. PEN. CODE

ANN. § 42.06 (Vernon 1994). A closely allied statute defines "emergency" under "Interference With Public Duties" as "a condition or circumstance in which an individual is or is reasonable believed by the person transmitting the communication to be in *imminent danger* of serious bodily injury." See TEX. PEN CODE. ANN. § 38.15(e) (emphasis added.) If we view this element in the context of the cul de sac neighborhood, "playing alone in the street unsupervised" is hardly a past emergency.[10]

For the reasons stated above, I would reverse and render.

**9.** I note CPS had never heard of prosecuting this type of purported false report. This neighborhood squabble has also escalated to a damage lawsuit action by complainant against both appellant and CPS. The latter she dismissed, however, after apparently obtaining the promised confidential identity of the neighbor, appellant. I hesitatingly disapprove (not having been there) of the trial judge's remarks, from the bench but outside the presence of the jury criticizing the "... God like image of appellant." Similarly, the judge sustained many of the numerous disruptive, obfuscating, objections by the State

but refused to sustain obvious defense hearsay objections because "it was already in evidence." And still the trial judge in the end exhibited great wisdom, mercy and courage by probating this member of the healing profession's jail sentence.

**10.** Because of today's majority holding, the old adage "You can't make a silk purse out of a sow's ear" is henceforth not recognized in Texas. And the reason is: The case of the yellow mail box.