Reversed and Remanded and Majority and Dissenting Opinions filed June
29, 2006









Reversed and Remanded and Majority and Dissenting
Opinions filed June 29, 2006.

 

In The

 

Fourteenth Court of
Appeals

____________

 

NO. 14-05-00031-CR

____________

 

CALVIN JOSEPH SMITH, Appellant

 

V.

 

THE STATE OF TEXAS, Appellee

 

 

 

On Appeal from the 278th District Court

Walker County, Texas

Trial Court Cause No. 20863-C

 

 

 

M A J O R
I T Y   O P I N I O N

            Appellant,
Calvin Joseph Smith, appeals from his conviction for reckless injury to a
child.  After appellant pleaded guilty, the trial court found him guilty and
assessed punishment at twenty years’ imprisonment and a $10,000 fine.  On
appeal, appellant contends that (1) the sentence imposed constituted cruel and
unusual punishment under both the United States and Texas constitutions; (2)
the trial court considered extraneous offenses in assessing punishment when
there was no evidence appellant committed such offenses; and (3) the trial
court incorrectly concluded that reckless injury constitutes or is tantamount
to 








murder.  Finding that the
trial court improperly considered extraneous offenses in assessing punishment,
we reverse and remand for further proceedings.

Background

            This is a
troubling case.  The trial judge was clearly troubled by it, based on his
lengthy comments from the bench.  The prosecutor appeared troubled based on his
admissions regarding the state of the evidence and decision to significantly
reduce the seriousness of the charged offense.  The investigating officers also
appeared troubled by the case, as they were unable to procure much evidence
regarding how the child was injured and also apparently lost at least portions
of the case file.  We are also troubled by this case.

            Appellant was
originally charged with capital murder for causing the death of his
five-month-old daughter by striking her in the abdomen.  The decedent’s mother,
Diretha Jones, was also charged with capital murder.  The prosecutor
subsequently dismissed the charge against Jones, apparently due to lack of
evidence, and filed a motion to proceed against appellant on the lesser
included offense of reckless injury to a child.  Pursuant to an agreement with
prosecutors, appellant pleaded guilty to this offense.  In his Written
Stipulations and Waivers, appellant stated that on or about November 20, 2000,
he recklessly caused serious bodily injury to his daughter by striking her in
the abdomen.

            The trial
court ordered a presentence investigation report (PSI).  In the PSI, the
“State’s Version” of events is described as follows:

            On
the night of November 19, 2000, [appellant] arrived at the Huntsville Memorial
Hospital Emergency Room with his daughter . . . .  Small bruises were found on
her right lower abdomen and she displayed signs of severe internal abdominal
bleeding.  The bruising was yellow in color and appeared to be approximately
two to three days old.  The defendant reported that the baby was lying on her
stomach when he went to check on her after a nap and had spit up some food.  He
picked her up and she was “dazed.”  She was breathing hard on the way to the
hospital and stopped breathing upon her arrival at the hospital.  The diagnoses
[sic] of Muhammed Khan, emergency room physician, was acute respiratory arrest,
acute hemorrhagic shock and severe anemia (due to loss of blood), acute blunt
trauma and rupture of internal abdominal viscous (layer of tissue covering
internal organs), and acute renal failure.  It was also believed that these
injuries were sustained as the result of child abuse.  Due to her injuries, the
child was life-flighted to Herman [sic] Children’s Hospital in Houston.

            Khan
observed [decedent]’s parents during their time at the hospital.  He indicated
that the defendant seemed upset about the child’s condition and asked
questions. . . . .  Diretha Jones, the child’s mother[,] did not seem concerned
and paced the emergency room.

            When
[decedent] arrived at Herman [sic] Children’s Hospital, she was in full
cardiopulmonary arrest.  She was resuscitated and sent to the operating room .
. . .  The diagnoses after surgery included bilateral abdominal trauma,
hypovolemic shock (decreased blood volume), abdominal compartment syndrome,
proximal jejunal (second of the small intestine) perforation, pancreatic
contusion, and bilateral perinephric hematomas (bruises to the kidneys). 
[Decedent] had healing fractures to four ribs, which were approximately 10-14
days old.  In addition, there were six to seven bruises on the child’s right
side as well as possible injury to her vagina.  Physicians explained that the
injury to the vagina may have been a result of the substantial internal injury
she received and not necessarily indicative of sexual abuse.  The abdominal
injury was believed to have been sustained during a range of six to twelve
hours prior to arrival at the hospital; however, the range could have been much
longer or shorter, depending on the victim.  Reports also indicate that
[decedent]’s injuries could not have occurred as the defendant stated due to
her lack of blood upon arrival at the hospital.  These injuries would have been
extremely painful and the child would have been crying “inconsolably.”  Dr.
Brad Alpert . . . believed the rib injuries were consistent with Shaken Baby
Syndrome.

            .
. . .  [Decedent] died as a result of her injuries.  She was five months and
five days old.

            Results of a skeletal scan conducted after
[decedent]’s death indicated that she had two fractured legs, both in different
stages of healing.

            The
“Defendant’s Version” of events is described in the PSI as follows:

            .
. . .  He advised that Diretha Jones, [decedent]’s mother, brought the child to
his house between 9:00 a.m. and 10:00 a.m. on the morning of November 19,
2000.  Two of the defendant’s friends showed up after Jones left and they
stayed for approximately one hour.  Jones returned shortly thereafter and left
again around noon for work.  Another friend came by and was holding the baby
while the defendant went to his vehicle.  At approximately 1:45 p.m., Smith
left with the child to attend a local funeral.  [Decedent] had fallen asleep and
was still sleeping when Smith returned home at 3:15 p.m.  She was put down for
her nap.  At 6:00 p.m., he went in to wake her and give her a bath.  When he
picked her up, he noticed that she was “in and out of it” and groggy; he
attributed this to the fact that he had awoken her.  He undressed her and
placed her in the bathtub.  Smith said she continued to stare straight ahead
and had a blank look on her face when he waved his hand in front of her.  He
removed her from the bathtub, laid her on the floor, and called to her.  Smith
said that her breathing was shallow and she did not respond to him.  The
defendant did not check her pulse but immediately began applying chest
compressions.  He did not realize he was doing this until he heard “something
in her throat.”  He then dressed her . . . and took her to [the emergency
room]. . . .  Smith wished he had not “panicked” and did not know he was
applying compressions. . . .  The surgeon in Houston informed him that applying
compressions could not have caused the injuries. . . .  He . . . was told that
his daughter died as a result of blunt force trauma to the abdomen.

            Smith
claimed that he does not know what happened to his daughter.

            .
. . .

            In a statement given on November 21, 2000,
Smith said that Jones never left his residence from the time she dropped the
child off until she left for work.  Smith declared that the baby “never left my
sight” except when she was sleeping and said he “did not leave her with anyone
for anything during that entire time.”

            Also in the
PSI, it states that the Huntsville Police Department obtained decedent’s
medical records from her pediatrician; however, when the author of the PSI
requested the records from the department, the records could not be found.  It
is further noted that appellant (1) had no prior criminal history; (2) married
Diretha Jones, the decedent’s mother, after the child’s death; and (3) showed
few if any indicators for drug or alcohol abuse.

            During the
punishment phase, appellant presented numerous favorable character witnesses. 
He also called Sheila Hugo, author of the PSI, as a witness.  After counsel
concluded their questioning, the trial judge asked several questions.  In
response, Hugo stated that she had received medical records from the decedent’s
pediatrician but that they did not  contain any additional relevant information
on the child’s condition.  She further testified that she was not able to
establish when appellant had possession of the child prior to the day she was
taken to the hospital.  Although the child’s mother usually went to work at
noon, appellant was not necessarily the child’s caretaker while the mother was
away.  The maternal grandmother also cared for the child.  Hugo did not
interview the grandmother.

            Toward the
end of his questioning, the judge stated: “This question is very important to
me.  Is there any record that you have looked at that would place this
defendant in the possession of this child for a week at anytime during a week
prior to November 19th?”  Hugo responded “No, sir.”

            After the
judge concluded his questioning, the following exchange occurred:

            THE
COURT:  . . . .  I can tell you I been [sic] through this file and I now know
why it has taken forever to get this thing to trial.  I don’t know what he’s
pleading guilty to, what act, what reckless act he is really pleading guilty
to.  Because if you look at these records there were bruises of the ribs, older
injuries.  I don’t know what to make of this case insofar as—

            [DEFENSE
COUNSEL]: The ribs were ten to fourteen days.  The bruises were two to three
days.

            THE
COURT: That’s what bothers me about this plea and this case.  And, of course,
that makes a big difference in punishment.  [¶]  Makes a real big difference. 
But I’m assuming that from the plea that—the plea bargain that had been struck
here, that number one the State couldn’t make a capital murder case.  And then
the next thing down would be murder, manslaughter, criminally negligent
homicide, and now we are down to injury to a child.  [¶]  Which is reckless injury. 
[¶]  You have multiple parties caring for this child.  The mother, her parents,
and I believe a grandparent . . . .

            You
haven’t helped me much here on these—the child was recovering from broken ribs,
right?

            [PROSECUTOR]:
Correct.

            THE
COURT: Ten to Fourteen days prior to this.

            [PROSECUTOR]:
The rib fractures were.

            THE
COURT: And bruises two to three days prior to this.

            [PROSECUTOR]:
And bruises older than two to three days.

            THE
COURT: Are you asking me to take that into consideration on this?

            [PROSECUTOR]:
Well, Judge—

            THE
COURT: You see, you kind of blindfolded me here.  I don’t have a heck of a lot
to go on to make a rational judgment about this thing.  [¶]  It leaves me in a
box about this stuff.  I don’t know if the child was injured when she got
there.  I don’t know when this child was injured.  I really don’t.  And you
can’t determine from the records we have here except his plea to recklessly— 
[¶]  Then these questions about the broken ribs fourteen days old, the bruises
that are three days old.

. . . .

            [PROSECUTOR]:
I think that the Court needs to concentrate on the blunt force trauma suffered
by that child and the resultant internal bleeding that he plead [sic] guilty
to, recklessly causing that resulted in her death.

            I
can’t sit here and tell you that I can prove to you beyond a reasonable doubt
any of those injuries were caused by him other than that he plead [sic] guilty
to recklessly causing that blunt force trauma to her abdomen.

. . . .

            THE
COURT:  . . . .  I do agree with you that the broken ribs to the child and to
[sic] the bruises that were several days old, there is absolutely no evidence
here that would support a finding that [appellant] had anything to do with
that.

            .
. . .

            This is about the worst investigation I
ever saw.  There were people that could have been interviewed and establish
[sic] the time line on all of this stuff.  I’m not aware of it.  It may be in
your files.

            The court
recessed the punishment hearing and reconvened nine days later to hear closing
argument.  At the conclusion of argument, the trial judge made the following
comments and had the following exchanges with counsel.

            THE
COURT: [Prosecutor], you agree with me that it was a gross mistake, an error
for the State to go forward sixteen days from the date this child died to rush
to an indictment, that length of time, when you didn’t know who or how this
child lost her life?  [¶]  That the iron curtain of silence of the Fifth
Amendment fell when the indictment was rendered on December 6th, 2000.  And prior
to that time the defendant in this case had been talking to the police and
giving statements.

            [PROSECUTOR]:
Yes, sir.

            .
. . .

            THE
COURT:  [T]he evidence as to what really happened on that day is still rather
murky.  About all we have is the statement of the defendant.  [¶]  And there is
no statement from Diretha Jones.  [¶]  But then I look at the hospital records
and I have been trying to find the radiology record and I been [sic] trying to
find the statements that are referred to in the incident report.  [¶]  I
understand that the Huntsville Police Department may have lost their file in
this case; is that correct?

            [PROSECUTOR]:
Yes, Your Honor. . . .

            THE
COURT: I don’t know how you lose a file in a capital murder—two capital murder
cases, but apparently that was done in this case.  [¶]  But I look at the
injuries that this child had.  You have a hematoma on the brain, you have
bruising both anteriorly and posteriorly to the child’s body.  You have three
broken ribs, three tears in her anus and you have tears in her vagina.  There
is a reference in the police officer’s report—I don’t know if it is accurate or
not and I don’t really consider this in assessing whatever punishment in this
case, but there is a reference in there that the child had two—that both of her
legs had fractures in them that were healing.  I have not seen that and I’m
not—I’m just mentioning that as an explanation about what I’m fixing to do. 
And I don’t know whether that is true or not because I do not have the records
other than what was made by Officer Lunsford in his report.  There is evidence
of some of these—this bruising both to her back and to her front as being
healing, which means it didn’t happen on November 19th.  And there is—so out of
Dr. Prier’s [the pediatrician’s] records on October—I believe the 24th, she was
taken to Dr. Prier and was okay except maybe for some flu, I believe, or
sniffles or things that you have with babies.

            But
I can only conclude from what I have seen that this child was brutally
murdered, brutally tortured.  And, furthermore, I cannot believe, . . . I find
it unreasonable that anyone could believe that the people who—the mother and
father of the child could have not known of these matters that I have discussed
that are found in these medical records.  And they are found in the autopsy—and
there is no mention in the autopsy of the broken legs.  But that’s the only
conclusion I can reach in this case is that is why this little child died.  And
sure, she died from a perforated intestine and so we don’t know all that went
on.  And we don’t have—we don’t have the facts and circumstances that are—that
led up to this little girl’s death.  But I do believe that whatever went on,
whatever happened to this little girl, I can only conclude that [appellant] not
only knew about it—he has admitted to striking the girl, but the injuries and
damages that I see in the records don’t—they don’t come about by one blow. 
They don’t come about by one striking.  And they didn’t all happen on November
19th when the baby died.  I mean, when the baby was taken to the hospital.

            .
. . .

            [M]y
preliminary finding in this case and my sentence will be the maximum that is
allowed by law in this case. . . .  I don’t want to send someone to prison for
twenty years, and if evidence could be produced that show [sic] my conclusions
are wrong or that someone else did that then I would revisit this issue . . .
.  [¶]  But, you know, I could not live with myself if I didn’t do everything I
could to try to set the record right and hopefully get to the truth about what
happened to a five month old female child who was handled in the way that she
was by someone or more than one, I don’t know.

 

            In a
separate, brief hearing, the trial court sentenced appellant to twenty years in
prison and a $10,000 fine, the maximum sentence permitted for reckless injury
to a child.  Tex. Penal Code Ann.
§§ 12.33 (Vernon 2003), 22.04(e) (Vernon Supp. 2005).

Extraneous
Offenses

            In his third
issue, appellant contends that he was denied a fair and impartial punishment
hearing because the trial court considered extraneous offenses in assessing
punishment when there was no evidence appellant committed such offenses.  Under
article 37.07, in a punishment hearing, evidence may be admitted “of an
extraneous crime or bad act that is shown beyond a reasonable doubt by evidence
to have been committed by the defendant or for which he could be held
criminally responsible, regardless of whether he has previously been charged
with or finally convicted of the crime or act.”  Tex. Code Crim. Proc. Ann. art. 37.07, § 3(a)(1) (Vernon Supp. 2005).  When a trial court, rather than a jury, assesses punishment, the
court may consider an extraneous offense in assessing punishment only if it
finds that the offense was proven beyond a reasonable doubt.  Williams v.
State, 958 S.W.2d 844, 845 (Tex. App.—Houston [14th Dist.] 1997, pet.
ref’d).

            Here, the
trial judge spoke at length regarding the dearth of evidence establishing how
the decedent’s various injuries occurred.  And from the record before us, it
appears that the judge was correct in determining that there was no evidence to
establish exactly which of the decedent’s injuries appellant caused.  Indeed,
as the judge himself noted, there is virtually no evidence regarding cause other
than appellant’s own statements.  Appellant pleaded guilty to reckless injury
to a child occurring on or about November 20, 2002.  In his statement,
appellant asserted that his only physically aggressive conduct toward his
daughter occurred when he attempted to administer CPR when she became
unresponsive after a nap.

            However, at
the conclusion of the punishment hearing, the judge clearly indicated that he
was considering extraneous bad acts in assessing appellant’s punishment.  He
stated:

I’m just mentioning that as an explanation about what
I’m fixing to do. . . .  There is evidence of some of these—this bruising both
to her back and to her front as being healing, which means it didn’t happen on
November 19th. . . .  But I can only conclude from what I have seen that this
child was brutally murdered, brutally tortured. . . .  But I do believe that
whatever went on, whatever happened to this little girl, I can only conclude
that [appellant] not only knew about it—he has admitted to striking the girl,
but the injuries and damages that I see in the records don’t—they don’t come
about by one blow.  They don’t come about by one striking.  And they didn’t all
happen on November 19th . . . when the baby was taken to the hospital.

            Thus, it
appears the court was taking into consideration that appellant may have (1)
“brutally murdered, brutally tortured” the decedent; (2) injured the decedent
prior to November 19; and/or (3) known that the decedent was being “brutally
murdered, brutally tortured” and done nothing about it.[1] 
However, none of these conclusions are supported by evidence in the record.  In
fact, the prosecutor did not attempt to put on evidence tying appellant to
these other offenses and admitted to the judge that “I can’t sit here and tell
you that I can prove to you beyond a reasonable doubt any of those injuries
were caused by him other than that he plead [sic] guilty to recklessly causing
that blunt force trauma to her abdomen.”

            Of course,
the trial court did not have to accept appellant’s self-serving version of
events as true (that he only performed CPR, that he did not know what happened
to his daughter), but there is no other direct evidence regarding how the
decedent’s injuries occurred.  The medical reports are evidence that she was
horribly mistreated over a period of time, but they are not evidence that
appellant was the person who mistreated her over time or that he knew that it
was occurring.  This is not to say that the court could not have considered the
medical reports as evidence that appellant’s reckless injury of the child was
not by CPR but by some other, more opprobrious means.  However, nothing in the
reports is sufficient to either (1) convert appellant’s plea of guilty to
reckless injury into evidence of acts committed intentionally or knowingly
(such as murder or torture), or (2) hold appellant responsible for injuries
occurring prior to November 19.  See generally Tex. Penal Code Ann. § 19.02(b) (Vernon 2002) (stating
elements of murder offense); Black’s Law
Dictionary 1498 (7th ed. 1999) (defining torture).  It is impossible to
tell from the PSI exactly which of the reported injuries occurred on November
19 and which predated the only date on which it was established that appellant
had possession of the decedent.[2] 
Furthermore, as testified to by Sheila Hugo, author of the PSI, and as
emphasized by the judge, there is no evidence establishing that the decedent
was in appellant’s possession on any day between her last doctor’s visit, when
no injuries were noted, and November 19.[3] 
The absence of evidence that someone else committed horrible acts against the
decedent does not constitute evidence that appellant committed the extraneous
acts.  Therefore, we conclude that the trial court improperly considered
extraneous offenses in assessing appellant’s punishment.

            The dissent
asserts that circumstantial evidence supports the conclusion that appellant
knew about prior abuse of the decedent but did nothing about it.  See
Kutzner v. State, 994 S.W.2d 180, 184 (Tex. Crim. App. 1999) (holding that
circumstantial evidence alone can meet the beyond-a-reasonable-doubt standard
for considering extraneous offenses).  To reach this conclusion, the dissent
impermissibly stacks inference upon inference.  See Frost v. State, 2
S.W.3d 625, 635-36 (Tex. App.—Houston [14th Dist.] 1999, pet. ref’d) (“[I]t is
well established that an inference of fact cannot be based upon another
inference of fact.”).

            First, the
dissent infers that a care giver would have noticed and been alarmed by the
decedent’s prior injuries.  This is despite the fact that (1) the record does
not contain any of the decedent’s medical records, (2) no expert (or any other
witness) testified regarding when the injuries occurred or whether they would
have been noticeable, and (3) it is impossible to determine from the PSI report
precisely when each of the injuries occurred.  The dissent notes that according
to the PSI, when the decedent arrived at the hospital on November 19, she had
severe internal injuries that would have been extremely painful and caused her
to cry inconsolably.  However, these statements do not establish that any
injuries suffered before to November 19 would have been noticeable to a care
giver; the dissent infers that conclusion from the nature of the prior
injuries.  The dissent further mentions that the decedent had several bruises
that apparently occurred before November 19 but were still visible on that
date.  However, there is no indication of the severity of the bruising; thus,
while bruising on an infant should concern a parent, such evidence does not
demonstrate that a care giver would have known that the child was being
abused.  The dissent also mentions the evidence regarding leg fractures and
“healing” rib fractures.  However, the judge indicated that he was not considering
the leg fractures because the evidence was unclear in regard to their
existence, and there was no evidence that a care giver would have noticed and
been alarmed by the rib fractures.  The dissent again only infers such from the
nature of the injuries.

            Second, the
dissent infers that appellant may have had contact with the decedent during the
period of time in which the prior abuse occurred.  The dissent reaches this
conclusion despite Sheila Hugo’s testimony that there was no evidence that the decedent
was in appellant’s possession on any day between her last doctor’s visit, when
no injuries were noted, and November 19.  The dissent initially references
testimony from a reverend and his wife who each testified that they saw
appellant with the decedent whenever he brought her to church.  However, these
witnesses gave no indication of when appellant last brought the decedent to
church. The dissent additionally points to evidence that appellant cared for
the decedent for approximately eight hours on November 19 before taking her to
the emergency room.  However, viewing this as direct evidence that appellant
had contact with the decedent during a time period in which a care giver would
have noticed and been alarmed by the decedent’s injuries is problematic for two
reasons: (1) it is questionable whether by November 19 the prior injuries would
still have been apparent and concerning to a care giver—the rib injuries were
ten to fourteen days old and the bruises were two to three days old; and (2) it
is undisputed that appellant took action on November 19—he brought the decedent
to the emergency room.  Consequently, the evidence that the decedent was in
appellant’s care on November 19 does not establish that he had contact with her
during prior periods of abuse.  The dissent merely infers that such contact
occurred.

            Based on
these two inferences—that a care giver would have noticed and been alarmed by
the decedent’s prior injuries and that appellant had contact with the decedent
during the relevant time period—the dissent additionally infers that appellant
actually knew about the abuse and did nothing.  Such inference stacking does
not meet the beyond-a-reasonable-doubt standard.  See, e.g., Tippitt v.
State, 41 S.W.3d 316, 327 (Tex. App.—Fort Worth 2001, no pet.).

Harm
Analysis

            We now turn
to whether the trial court’s erroneous consideration of extraneous offenses was
harmful to appellant.  See Johnson v. State, 871 S.W.2d 820, 824 (Tex.
App.—Houston [14th Dist.] 1994, pet. ref’d) (conducting harm analysis on trial
court’s improper consideration of evidence regarding extraneous offenses).  We
shall not overturn the trial court’s judgment if, after reviewing the record as
a whole, we have a fair assurance that the trial court’s error did not
influence the fact-finder or had only a slight effect.   Johnson v. State,
967 S.W.2d 410, 417 (Tex. Crim. App. 1998); State v. Blankenship, 170
S.W.3d 676, 683-84 (Tex. App.—Austin 2005, pet. ref’d).  The trial court
assessed the maximum punishment allowed in this case, and, as the above
discussion demonstrates, the record reflects that he erroneously considered
unproven extraneous offenses in doing so.  The conclusion that the trial judge
considered extraneous acts in assessing punishment is bolstered by the judge’s
suggestion during the first day of the punishment hearing that the existence of
older injuries could “[make] a big difference in punishment.”  Accordingly, we
are unable to say with fair assurance that the trial court’s erroneous
consideration of extraneous offenses did not influence the assessment of
punishment or had only a slight effect.  Thus, we sustain appellant’s third
issue and reverse and remand for a new punishment hearing.[4]

            The trial
court’s judgment is reversed and remanded.

 

 

                                                                                    

                                                                        /s/        Adele
Hedges

                                                                                    Chief
Justice

 

 

 

 

Judgment
rendered and Majority and Dissenting Opinions filed June 29, 2006. (Yates, J.
Dissenting.)

Panel consists of Chief Justice
Hedges and Justices Yates and Anderson.

Publish — Tex. R. App. P. 47.2(b).









[1] 
The trial court also mentioned the leg fractures that were identified in the
PSI, but he said that because he was unsure whether the information was
accurate, he was not going to consider it in assessing punishment.  This
supports the conclusion that he was considering all of the child’s other
injuries in assessing punishment.

            The judge’s motive may
have been to force someone to come forward with evidence or an explanation as
to what happened to the child.  He stated: “I could not live with myself if I
didn’t do everything I could to try to set the record right and hopefully get
to the truth about what happened to a five month old female child who was
handled in the way that she was by someone or more than one, I don’t know.”





[2] 
The decedent’s actual medical records do not appear in the record on appeal. 
In statements to the court, the prosecutor explained that there was difficulty
in getting the treating physicians into court to testify.  Apparently, one of
them was out of the country.





[3] 
Hugo implied in her testimony that appellant sometimes kept the decedent while
decedent’s mother was at work; however, Hugo admitted that there was no
information regarding whether appellant had possession of the decedent during
the period between the last doctor’s visit and the trip to the emergency room
on November 19.





[4] 
Our opinion should not be construed as holding that the sentence imposed by the
trial court constituted cruel and unusual punishment under either the United States or Texas constitutions.  Because of our ruling on issue three, we do not consider and
take no position on the other issues appellant raises.