**Calvin Joseph SMITH, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 14–05–00031–CR.**

Court of Appeals of Texas, Houston (14th Dist.).

June 29, 2006.

Discretionary Review Granted Nov. 22, 2006.

---

William F. Carter, Bryan, Houston, for appellant.

David P. Weeks, Stephanie S. Stroud, Huntsville, Matthew W. Paul, Austin, for appellee.

Panel consists of Chief Justice HEDGES and Justices YATES and ANDERSON.

## MAJORITY OPINION

ADELE HEDGES, Chief Justice.

Appellant, Calvin Joseph Smith, appeals from his conviction for reckless injury to a child. After appellant pleaded guilty, the trial court found him guilty and assessed punishment at twenty years' imprisonment

and a $10,000 fine. On appeal, appellant contends that (1) the sentence imposed constituted cruel and unusual punishment under both the United States and Texas constitutions; (2) the trial court considered extraneous offenses in assessing punishment when there was no evidence appellant committed such offenses; and (3) the trial court incorrectly concluded that reckless injury constitutes or is tantamount to murder. Finding that the trial court improperly considered extraneous offenses in assessing punishment, we reverse and remand for further proceedings.

## Background

This is a troubling case. The trial judge was clearly troubled by it, based on his lengthy comments from the bench. The prosecutor appeared troubled based on his admissions regarding the state of the evidence and decision to significantly reduce the seriousness of the charged offense. The investigating officers also appeared troubled by the case, as they were unable to procure much evidence regarding how the child was injured and also apparently lost at least portions of the case file. We are also troubled by this case.

Appellant was originally charged with capital murder for causing the death of his five-month-old daughter by striking her in the abdomen. The decedent's mother, Diretha Jones, was also charged with capital murder. The prosecutor subsequently dismissed the charge against Jones, apparently due to lack of evidence, and filed a motion to proceed against appellant on the lesser included offense of reckless injury to a child. Pursuant to an agreement with prosecutors, appellant pleaded guilty to this offense. In his Written Stipulations and Waivers, appellant stated that on or about November 20, 2000, he recklessly caused serious bodily injury to his daughter by striking her in the abdomen.

The trial court ordered a presentence investigation report (PSI). In the PSI, the "State's Version" of events is described as follows:

On the night of November 19, 2000, [appellant] arrived at the Huntsville Memorial Hospital Emergency Room with his daughter.... Small bruises were found on her right lower abdomen and she displayed signs of severe internal abdominal bleeding. The bruising was yellow in color and appeared to be approximately two to three days old. The defendant reported that the baby was lying on her stomach when he went to check on her after a nap and had spit up some food. He picked her up and she was "dazed." She was breathing hard on the way to the hospital and stopped breathing upon her arrival at the hospital. The diagnoses [sic] of Muhammed Khan, emergency room physician, was acute respiratory arrest, acute hemorrhagic shock and severe anemia (due to loss of blood), acute blunt trauma and rupture of internal abdominal viscous (layer of tissue covering internal organs), and acute renal failure. It was also believed that these injuries were sustained as the result of child abuse. Due to her injuries, the child was lifeflighted to Herman [sic] Children's Hospital in Houston.

Khan observed [decedent]'s parents during their time at the hospital. He indicated that the defendant seemed upset about the child's condition and asked questions. .... Diretha Jones, the child's mother[,] did not seem concerned and paced the emergency room.

When [decedent] arrived at Herman [sic] Children's Hospital, she was in full cardiopulmonary arrest. She was resuscitated and sent to the operating room.... The diagnoses after surgery included bilateral abdominal trauma, hy-

povolemic shock (decreased blood volume), abdominal compartment syndrome, proximal jejunal (second of the small intestine) perforation, pancreatic contusion, and bilateral perinephric hematomas (bruises to the kidneys). [Decedent] had healing fractures to four ribs, which were approximately 10–14 days old. In addition, there were six to seven bruises on the child's right side as well as possible injury to her vagina. Physicians explained that the injury to the vagina may have been a result of the substantial internal injury she received and not necessarily indicative of sexual abuse. The abdominal injury was believed to have been sustained during a range of six to twelve hours prior to arrival at the hospital; however, the range could have been much longer or shorter, depending on the victim. Reports also indicate that [decedent]'s injuries could not have occurred as the defendant stated due to her lack of blood upon arrival at the hospital. These injuries would have been extremely painful and the child would have been crying "inconsolably." Dr. Brad Alpert ... believed the rib injuries were consistent with Shaken Baby Syndrome.

. . . . [Decedent] died as a result of her injuries. She was five months and five days old.

Results of a skeletal scan conducted after [decedent]'s death indicated that she had two fractured legs, both in different stages of healing.

The "Defendant's Version" of events is described in the PSI as follows:

. . . . He advised that Diretha Jones, [decedent]'s mother, brought the child to his house between 9:00 a.m. and 10:00 a.m. on the morning of November 19, 2000. Two of the defendant's friends showed up after Jones left and they stayed for approximately one hour.

Jones returned shortly thereafter and left again around noon for work. Another friend came by and was holding the baby while the defendant went to his vehicle. At approximately 1:45 p.m., Smith left with the child to attend a local funeral. [Decedent] had fallen asleep and was still sleeping when Smith returned home at 3:15 p.m. She was put down for her nap. At 6:00 p.m., he went in to wake her and give her a bath. When he picked her up, he noticed that she was "in and out of it" and groggy; he attributed this to the fact that he had awoken her. He undressed her and placed her in the bathtub. Smith said she continued to stare straight ahead and had a blank look on her face when he waved his hand in front of her. He removed her from the bathtub, laid her on the floor, and called to her. Smith said that her breathing was shallow and she did not respond to him. The defendant did not check her pulse but immediately began applying chest compressions. He did not realize he was doing this until he heard "something in her throat." He then dressed her ... and took her to [the emergency room].... Smith wished he had not "panicked" and did not know he was applying compressions.... The surgeon in Houston informed him that applying compressions could not have caused the injuries.... He ... was told that his daughter died as a result of blunt force trauma to the abdomen.

Smith claimed that he does not know what happened to his daughter.

. . . .

In a statement given on November 21, 2000, Smith said that Jones never left his residence from the time she dropped the child off until she left for work. Smith declared that the baby "never left my sight" except when she was sleeping

and said he "did not leave her with anyone for anything during that entire time."

Also in the PSI, it states that the Huntsville Police Department obtained decedent's medical records from her pediatrician; however, when the author of the PSI requested the records from the department, the records could not be found. It is further noted that appellant (1) had no prior criminal history; (2) married Diretha Jones, the decedent's mother, after the child's death; and (3) showed few if any indicators for drug or alcohol abuse.

During the punishment phase, appellant presented numerous favorable character witnesses. He also called Sheila Hugo, author of the PSI, as a witness. After counsel concluded their questioning, the trial judge asked several questions. In response, Hugo stated that she had received medical records from the decedent's pediatrician but that they did not contain any additional relevant information on the child's condition. She further testified that she was not able to establish when appellant had possession of the child prior to the day she was taken to the hospital. Although the child's mother usually went to work at noon, appellant was not necessarily the child's caretaker while the mother was away. The maternal grandmother also cared for the child. Hugo did not interview the grandmother.

Toward the end of his questioning, the judge stated: "This question is very important to me. Is there any record that you have looked at that would place this defendant in the possession of this child for a week at anytime during a week prior to November 19th?" Hugo responded "No, sir."

After the judge concluded his questioning, the following exchange occurred:

THE COURT: . . . . I can tell you I been [sic] through this file and I now know why it has taken forever to get this thing to trial. I don't know what he's pleading guilty to, what act, what reckless act he is really pleading guilty to. Because if you look at these records there were bruises of the ribs, older injuries. I don't know what to make of this case insofar as—

[DEFENSE COUNSEL]: The ribs were ten to fourteen days. The bruises were two to three days.

THE COURT: That's what bothers me about this plea and this case. And, of course, that makes a big difference in punishment. [¶] Makes a real big difference. But I'm assuming that from the plea that—the plea bargain that had been struck here, that number one the State couldn't make a capital murder case. And then the next thing down would be murder, manslaughter, criminally negligent homicide, and now we are down to injury to a child. [¶] Which is reckless injury. [¶] You have multiple parties caring for this child. The mother, her parents, and I believe a grandparent. . . .

You haven't helped me much here on these—the child was recovering from broken ribs, right?

[PROSECUTOR]: Correct.

THE COURT: Ten to Fourteen days prior to this.

[PROSECUTOR]: The rib fractures were.

THE COURT: And bruises two to three days prior to this.

[PROSECUTOR]: And bruises older than two to three days.

THE COURT: Are you asking me to take that into consideration on this?

[PROSECUTOR]: Well, Judge—

THE COURT: You see, you kind of blindfolded me here. I don't have a

heck of a lot to go on to make a rational judgment about this thing. [¶] It leaves me in a box about this stuff. I don't know if the child was injured when she got there. I don't know when this child was injured. I really don't. And you can't determine from the records we have here except his plea to recklessly— [¶] Then these questions about the broken ribs fourteen days old, the bruises that are three days old.

. . . .

[PROSECUTOR]: I think that the Court needs to concentrate on the blunt force trauma suffered by that child and the resultant internal bleeding that he plead [sic] guilty to, recklessly causing that resulted in her death.

I can't sit here and tell you that I can prove to you beyond a reasonable doubt any of those injuries were caused by him other than that he plead [sic] guilty to recklessly causing that blunt force trauma to her abdomen.

. . . .

THE COURT: . . . . I do agree with you that the broken ribs to the child and to [sic] the bruises that were several days old, there is absolutely no evidence here that would support a finding that [appellant] had anything to do with that.

. . . .

This is about the worst investigation I ever saw. There were people that could have been interviewed and establish [sic] the time line on all of this stuff. I'm not aware of it. It may be in your files.

The court recessed the punishment hearing and reconvened nine days later to hear closing argument. At the conclusion of argument, the trial judge made the following comments and had the following exchanges with counsel.

THE COURT: [Prosecutor], you agree with me that it was a gross mistake, an error for the State to go forward sixteen days from the date this child died to rush to an indictment, that length of time, when you didn't know who or how this child lost her life? [¶] That the iron curtain of silence of the Fifth Amendment fell when the indictment was rendered on December 6th, 2000. And prior to that time the defendant in this case had been talking to the police and giving statements.

[PROSECUTOR]: Yes, sir.

. . . .

THE COURT: [T]he evidence as to what really happened on that day is still rather murky. About all we have is the statement of the defendant. [¶] And there is no statement from Diretha Jones. [¶] But then I look at the hospital records and I have been trying to find the radiology record and I been [sic] trying to find the statements that are referred to in the incident report. [¶] I understand that the Huntsville Police Department may have lost their file in this case; is that correct?

[PROSECUTOR]: Yes, Your Honor . . . .

THE COURT: I don't know how you lose a file in a capital murder—two capital murder cases, but apparently that was done in this case. [¶] But I look at the injuries that this child had. You have a hematoma on the brain, you have bruising both anteriorly and posteriorly to the child's body. You have three broken ribs, three tears in her anus and you have tears in her vagina. There is a reference in the police officer's report— I don't know if it is accurate or not and I don't really consider this in assessing whatever punishment in this case, but there is a reference in there that the child had two—that both of her legs had fractures in them that were healing. I have not seen that and I'm not—I'm just

mentioning that as an explanation about what I'm fixing to do. And I don't know whether that is true or not because I do not have the records other than what was made by Officer Lunsford in his report. There is evidence of some of these—this bruising both to her back and to her front as being healing, which means it didn't happen on November 19th. And there is—so out of Dr. Prier's [the pediatrician's] records on October—I believe the 24th, she was taken to Dr. Prier and was okay except maybe for some flu, I believe, or sniffles or things that you have with babies.

But I can only conclude from what I have seen that this child was brutally murdered, brutally tortured. And, furthermore, I cannot believe, . . . I find it unreasonable that anyone could believe that the people who—the mother and father of the child could have not known of these matters that I have discussed that are found in these medical records. And they are found in the autopsy—and there is no mention in the autopsy of the broken legs. But that's the only conclusion I can reach in this case is that is why this little child died. And sure, she died from a perforated intestine and so we don't know all that went on. And we don't have—we don't have the facts and circumstances that are—that led up to this little girl's death. But I do believe that whatever went on, whatever happened to this little girl, I can only conclude that [appellant] not only knew about it—he has admitted to striking the girl, but the injuries and damages that I see in the records don't—they don't come about by one blow. They don't come about by one striking. And they didn't all happen on November 19th when the baby died. I mean, when the baby was taken to the hospital.

. . . .

[M]y preliminary finding in this case and my sentence will be the maximum that is allowed by law in this case. . . . I don't want to send someone to prison for twenty years, and if evidence could be produced that show [sic] my conclusions are wrong or that someone else did that then I would revisit this issue. . . . [¶] But, you know, I could not live with myself if I didn't do everything I could to try to set the record right and hopefully get to the truth about what happened to a five month old female child who was handled in the way that she was by someone or more than one, I don't know.

In a separate, brief hearing, the trial court sentenced appellant to twenty years in prison and a $10,000 fine, the maximum sentence permitted for reckless injury to a child. TEX. PENAL CODE ANN. §§ 12.33 (Vernon 2003), 22.04(e) (Vernon Supp. 2005).

### Extraneous Offenses

 In his third issue, appellant contends that he was denied a fair and impartial punishment hearing because the trial court considered extraneous offenses in assessing punishment when there was no evidence appellant committed such offenses. Under article 37.07, in a punishment hearing, evidence may be admitted "of an extraneous crime or bad act that is shown beyond a reasonable doubt by evidence to have been committed by the defendant or for which he could be held criminally responsible, regardless of whether he has previously been charged with or finally convicted of the crime or act." TEX.CODE CRIM. PROC. ANN. art. 37.07, § 3(a)(1) (Vernon Supp.2005). When a trial court, rather than a jury, assesses punishment, the court may consider an extraneous offense in assessing punishment only if it finds that the offense was proven

beyond a reasonable doubt. *Williams v. State*, 958 S.W.2d 844, 845 (Tex.App.-Houston [14th Dist.] 1997, pet. ref'd).

Here, the trial judge spoke at length regarding the dearth of evidence establishing how the decedent's various injuries occurred. And from the record before us, it appears that the judge was correct in determining that there was no evidence to establish exactly which of the decedent's injuries appellant caused. Indeed, as the judge himself noted, there is virtually no evidence regarding cause other than appellant's own statements. Appellant pleaded guilty to reckless injury to a child occurring on or about November 20, 2002. In his statement, appellant asserted that his only physically aggressive conduct toward his daughter occurred when he attempted to administer CPR when she became unresponsive after a nap.

However, at the conclusion of the punishment hearing, the judge clearly indicated that he was considering extraneous bad acts in assessing appellant's punishment. He stated:

I'm just mentioning that as an explanation about what I'm fixing to do.... There is evidence of some of these—this bruising both to her back and to her front as being healing, which means it didn't happen on November 19th.... But I can only conclude from what I have seen that this child was brutally murdered, brutally tortured.... But I do believe that whatever went on, whatever happened to this little girl, I can

only conclude that [appellant] not only knew about it—he has admitted to striking the girl, but the injuries and damages that I see in the records don't—they don't come about by one blow. They don't come about by one striking. And they didn't all happen on November 19th ... when the baby was taken to the hospital.

Thus, it appears the court was taking into consideration that appellant may have (1) "brutally murdered, brutally tortured" the decedent; (2) injured the decedent prior to November 19; and/or (3) known that the decedent was being "brutally murdered, brutally tortured" and done nothing about it.[1] However, none of these conclusions are supported by evidence in the record. In fact, the prosecutor did not attempt to put on evidence tying appellant to these other offenses and admitted to the judge that "I can't sit here and tell you that I can prove to you beyond a reasonable doubt any of those injuries were caused by him other than that he plead [sic] guilty to recklessly causing that blunt force trauma to her abdomen."

Of course, the trial court did not have to accept appellant's self-serving version of events as true (that he only performed CPR, that he did not know what happened to his daughter), but there is no other direct evidence regarding how the decedent's injuries occurred. The medical reports are evidence that she was horribly mistreated over a period of time, but they are not evidence that appellant was the

---

1. The trial court also mentioned the leg fractures that were identified in the PSI, but he said that because he was unsure whether the information was accurate, he was not going to consider it in assessing punishment. This supports the conclusion that he was considering all of the child's other injuries in assessing punishment.

The judge's motive may have been to force someone to come forward with evidence or an explanation as to what happened to the child. He stated: "I could not live with myself if I didn't do everything I could to try to set the record right and hopefully get to the truth about what happened to a five month old female child who was handled in the way that she was by someone or more than one, I don't know."

person who mistreated her over time or that he knew that it was occurring. This is not to say that the court could not have considered the medical reports as evidence that appellant's reckless injury of the child was not by CPR but by some other, more opprobrious means. However, nothing in the reports is sufficient to either (1) convert appellant's plea of guilty to reckless injury into evidence of acts committed intentionally or knowingly (such as murder or torture), or (2) hold appellant responsible for injuries occurring prior to November 19. *See generally* TEX. PENAL CODE ANN. § 19.02(b) (Vernon 2002) (stating elements of murder offense); BLACK'S LAW DICTIONARY 1498 (7th ed.1999) (defining torture). It is impossible to tell from the PSI exactly which of the reported injuries occurred on November 19 and which predated the only date on which it was established that appellant had possession of the decedent.[2] Furthermore, as testified to by Sheila Hugo, author of the PSI, and as emphasized by the judge, there is no evidence establishing that the decedent was in appellant's possession on any day between her last doctor's visit, when no injuries were noted, and November 19.[3] The absence of evidence that someone else committed horrible acts against the decedent does not constitute evidence that appellant committed the extraneous acts. Therefore, we conclude that the trial court improperly considered extraneous offenses in assessing appellant's punishment.

The dissent asserts that circumstantial evidence supports the conclusion that appellant knew about prior abuse of the de-

cedent but did nothing about it. *See Kutzner v. State*, 994 S.W.2d 180, 184 (Tex. Crim.App.1999) (holding that circumstantial evidence alone can meet the beyond-a-reasonable-doubt standard for considering extraneous offenses). To reach this conclusion, the dissent impermissibly stacks inference upon inference. *See Frost v. State*, 2 S.W.3d 625, 635–36 (Tex.App.-Houston [14th Dist.] 1999, pet. ref'd) ("[I]t is well established that an inference of fact cannot be based upon another inference of fact.").

First, the dissent infers that a care giver would have noticed and been alarmed by the decedent's prior injuries. This is despite the fact that (1) the record does not contain any of the decedent's medical records, (2) no expert (or any other witness) testified regarding when the injuries occurred or whether they would have been noticeable, and (3) it is impossible to determine from the PSI report precisely when each of the injuries occurred. The dissent notes that according to the PSI, when the decedent arrived at the hospital on November 19, she had severe internal injuries that would have been extremely painful and caused her to cry inconsolably. However, these statements do not establish that any injuries suffered before to November 19 would have been noticeable to a care giver; the dissent infers that conclusion from the nature of the prior injuries. The dissent further mentions that the decedent had several bruises that apparently occurred before November 19 but were still visible on that date. However, there is no indication of the severity of the bruis-

---

2. The decedent's actual medical records do not appear in the record on appeal. In statements to the court, the prosecutor explained that there was difficulty in getting the treating physicians into court to testify. Apparently, one of them was out of the country.

3. Hugo implied in her testimony that appellant sometimes kept the decedent while decedent's mother was at work; however, Hugo admitted that there was no information regarding whether appellant had possession of the decedent during the period between the last doctor's visit and the trip to the emergency room on November 19.

ing; thus, while bruising on an infant should concern a parent, such evidence does not demonstrate that a care giver would have known that the child was being abused. The dissent also mentions the evidence regarding leg fractures and "healing" rib fractures. However, the judge indicated that he was not considering the leg fractures because the evidence was unclear in regard to their existence, and there was no evidence that a care giver would have noticed and been alarmed by the rib fractures. The dissent again only infers such from the nature of the injuries.

Second, the dissent infers that appellant may have had contact with the decedent during the period of time in which the prior abuse occurred. The dissent reaches this conclusion despite Sheila Hugo's testimony that there was no evidence that the decedent was in appellant's possession on any day between her last doctor's visit, when no injuries were noted, and November 19. The dissent initially references testimony from a reverend and his wife who each testified that they saw appellant with the decedent whenever he brought her to church. However, these witnesses gave no indication of when appellant last brought the decedent to church. The dissent additionally points to evidence that appellant cared for the decedent for approximately eight hours on November 19 before taking her to the emergency room. However, viewing this as direct evidence that appellant had contact with the decedent during a time period in which a care giver would have noticed and been alarmed by the decedent's injuries is problematic for two reasons: (1) it is questionable whether by November 19 the prior injuries would still have been apparent and concerning to a care giver—the rib injuries were ten to fourteen days old and the bruises were two to three days old; and (2) it is undisputed that appellant took

action on November 19—he brought the decedent to the emergency room. Consequently, the evidence that the decedent was in appellant's care on November 19 does not establish that he had contact with her during prior periods of abuse. The dissent merely infers that such contact occurred.

Based on these two inferences—that a care giver would have noticed and been alarmed by the decedent's prior injuries and that appellant had contact with the decedent during the relevant time period—the dissent additionally infers that appellant actually knew about the abuse and did nothing. Such inference stacking does not meet the beyond-a-reasonable-doubt standard. *See, e.g., Tippitt v. State,* 41 S.W.3d 316, 327 (Tex.App.-Fort Worth 2001, no pet.).

### *Harm Analysis*

We now turn to whether the trial court's erroneous consideration of extraneous offenses was harmful to appellant. *See Johnson v. State,* 871 S.W.2d 820, 824 (Tex.App.-Houston [14th Dist.] 1994, pet. ref'd) (conducting harm analysis on trial court's improper consideration of evidence regarding extraneous offenses). We shall not overturn the trial court's judgment if, after reviewing the record as a whole, we have a fair assurance that the trial court's error did not influence the fact-finder or had only a slight effect. *Johnson v. State,* 967 S.W.2d 410, 417 (Tex.Crim.App.1998); *State v. Blankenship,* 170 S.W.3d 676, 683–84 (Tex.App.-Austin 2005, pet. ref'd). The trial court assessed the maximum punishment allowed in this case, and, as the above discussion demonstrates, the record reflects that he erroneously considered unproven extraneous offenses in doing so. The conclusion that the trial judge considered extraneous acts in assessing punishment is bolstered by the judge's sugges-

**46**

tion during the first day of the punishment hearing that the existence of older injuries could "[make] a big difference in punishment." Accordingly, we are unable to say with fair assurance that the trial court's erroneous consideration of extraneous offenses did not influence the assessment of punishment or had only a slight effect. Thus, we sustain appellant's third issue and reverse and remand for a new punishment hearing.[4]

The trial court's judgment is reversed and remanded.

YATES, J., dissenting.

LESLIE BROCK YATES, Justice, dissenting.

I respectfully dissent to the majority's conclusion that the trial court erroneously considered extraneous offenses in assessing appellant's punishment. The majority finds that, despite "evidence that [the victim] was horribly mistreated over a period of time," the evidence nonetheless fails to support a conclusion that appellant knew about the abuse but failed to act. Because there was sufficient circumstantial evidence to support such a finding, I believe the majority errs in reversing and remanding on this issue.

A defendant recklessly endangers a child when he "intentionally, knowingly, recklessly, or with criminal negligence, by act or omission, engages in conduct that places a child ... in imminent danger of

death, bodily injury, or physical or mental impairment." Tex. Penal Code Ann. § 22.041(c) (Vernon Supp.2005). Such an offense is a state jail felony. Id. § 22.041(f). In this case, the trial court assessed punishment; thus, in its role as factfinder, the trial court could consider any extraneous offense evidence it found the State proved beyond a reasonable doubt. See Williams v. State, 958 S.W.2d 844, 845 (Tex.App.-Houston [14th Dist.] 1997, pet. ref'd).

The victim in this case was a five-month-old child. Although the majority correctly notes that Sheila Hugo, the PSI's author, could not pinpoint appellant's last contact with the victim before November 19, 2000, testimonial evidence from appellant's own witnesses indicates he was regularly involved with her.[1] Moreover, the record shows she was in his custody on November 19, 2000 for *at least eight hours* before he took her to the hospital. Sometime during or immediately before this period, the victim sustained severe abdominal injuries that ultimately caused her death. According to the PSI, which summarized the victim's medical records, these injuries "would have been extremely painful and the child would have been crying 'inconsolably.'" The evidence also establishes that in the weeks before the victim died, she suffered four broken ribs, fractures in both legs, vaginal and anal tears, and significant bruising.[2] These injuries were in

4. Our opinion should not be construed as holding that the sentence imposed by the trial court constituted cruel and unusual punishment under either the United States or Texas constitutions. Because of our ruling on issue three, we do not consider and take no position on the other issues appellant raises.

1. Reverend Samuel Thompson testified that appellant "always had [the victim] with him in his arms, and he's just treated her as a father would a child that he loves." Letha Thompson, the reverend's wife, testified that

she had seen the victim with appellant on "[m]any occasions" and had seen appellant care for her.

2. The majority notes that the record does not contain the victim's medical records. However, the record indicates that the victim's autopsy report, her pediatrician's records, and her records from Huntsville Memorial Hospital and Hermann Children's Hospital were used as source documents for the PSI, which appellant requested. Also, the record shows the trial court had these medical rec-

various stages of healing, and several of the injuries would have been visible to caregivers or caused her to exhibit signs of discomfort, alerting others to her condition.[3] The existence and severity of the victim's injuries, their duration, and appellant's relation to and contact with the victim constitute circumstantial evidence that he knowingly or recklessly endangered her life by failing to act. Circumstantial evidence alone can meet the beyond-a-reasonable-doubt threshold. *See Kutzner v. State*, 994 S.W.2d 180, 184 (Tex.Crim.App. 1999).

In addition, the majority states that the trial judge apparently not only considered that appellant knew about the injuries and did nothing but also considered that appellant may have brutally tortured and murdered the decedent. However, the record shows that after the punishment hearing, the trial judge noted that "there is absolutely no evidence" appellant caused the victim's bruises and broken ribs. Later, after closing arguments, the trial judge commented as follows:

> I can only conclude from what I have seen that this child was brutally murdered, brutally tortured.... *I find it unreasonable that anyone could believe that the people who—the mother and father of the child could have not known of these matters* that I have discussed that are found in these medical records.... I do believe that whatever went on, whatever happened to this little girl, *I can only conclude that [appellant] not only knew about it—he has admitted to striking the girl, but the injuries and damages that I see in the records don't—they don't come about by one blow.* They don't come about by one striking. And they didn't all happen on November 19th when the baby died.

(emphasis added). Thus, the record demonstrates that although the trial court did not believe the evidence showed appellant *caused* the victim's extraneous injuries, it found he must have *known* about them.[4]

---

ords in its file and reviewed them to ensure the PSI's accuracy. Finally, despite its complaint that the record contains no medical records, the majority describes the medical reports as "evidence" and discusses them at length.

3. The majority accuses the dissent of inference stacking, claiming the dissent infers the victim's injuries would have been visible to caregivers despite the absence of medical records or expert testimony as to when the injuries occurred and whether they were visible. However, the PSI, which summarized the medical evidence in the court's file, states the victim had "six to seven bruises" on her right side that were "yellow in color." Further, it is inconceivable that the victim would have been asymptomatic given her extensive list of injuries, which included, in addition to external bruising, "bilateral abdominal trauma, hypovolemic shock (decreased blood volume), abdominal compartment syndrome, proximal jejunal (second of the small intestine) perforation, pancreatic contusion, ... bilateral perinephric hematomas (bruises to the kidneys),"

healing fractures on four ribs, fractures in both legs, and possible vaginal injury. Moreover, although some of the injuries' dates were unknown, the PSI indicated the rib fractures were ten to fourteen days old, the bruises were two to three days old, and the abdominal injury was six to twelve hours old.

4. Moreover, the trial court could have considered evidence of appellant's truthfulness in weighing his claim that he did not see the victim's bruises. The Houston surgeon who treated the victim told appellant her abdominal injuries were inconsistent with his explanation for them (chest compressions). Further, the medical reports summarized in the PSI ruled out appellant's version of the victim's abdominal injury due to her severe blood loss on arrival. Given these inconsistencies, the trial court could reasonably have believed appellant knew of the victim's injuries—at least within the eight hours he had her before she arrived at the hospital—and disbelieved appellant's claim that he did not know of them.

Because the trial court could have found beyond a reasonable doubt that appellant was aware of the abuse and failed to act, I disagree with the majority's conclusion that the trial court erred in considering the victim's pre-existing injuries in assessing punishment.

For this reason, I dissent.