In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

NO. 09-15-00522-CR
NO. 09-15-00523-CR
NO. 09-15-00524-CR

_____

AMANDA DARLENE PIXLEY, Appellant

V.

THE STATE OF TEXAS, Appellee

**On Appeal from the 258th District Court
Polk County, Texas
Trial Cause Nos. 22617, 22618, and 22619**

## MEMORANDUM OPINION

In three separate indictments, a grand jury indicted Amanda Darlene Pixley

for sexual assault of T.D.,[1] a child under the age of seventeen. *See* Tex. Penal Code

Ann. § 22.011(a)(2) (West 2011). Pixley voluntarily entered a plea of no contest in

---

[1] To protect the privacy of the minor relevant to Pixley's case, we identify him by using initials that disguise his identity. *See* Tex. Const. art. I, § 30(a)(1) (granting crime victims "the right to be treated with fairness and with respect for the victim's dignity and privacy throughout the criminal justice process")].

each of the three cases, and the cases were tried together to the bench on the issue of punishment. At the conclusion of the hearing, the trial court sentenced Pixley to twenty years confinement in each case with the sentences to be served consecutively. Pixley now appeals, and in two issues, complains of (1) evidence admitted during her punishment hearing and (2) improper argument by the State at the punishment hearing. We overrule Pixley's issues and affirm the trial court's judgments.

## I.  Factual and Procedural Background

In October 2009, the Department of Family and Protective Services ("DFPS") placed Pixley's two young half-sisters, K.P. and C.P., in Pixley's custody. On January 13, 2010, an unconscious K.P., then twenty-one months old, was brought by ambulance to the hospital in Livingston, Texas, where she was found to have sustained severe head trauma, in addition to other injuries. The child was taken by Life Flight to Memorial Hermann Hospital in Houston for urgent surgical intervention, but she died in the operating room hours later. DFPS removed Pixley's other half-sister from her care after K.P.'s death. Law enforcement conducted an investigation and questioned Pixley, who was "seen as responsible for" K.P.'s death, but she was not arrested or formally charged for the death or the injuries to the child.

Unrelated to the foregoing, in 2011, Pixley allowed T.D., a sixteen year old boy, to live with her in her home for several months, during which time she and the

2

child maintained a sexual relationship. In 2012, Pixley was arrested and charged with sexual assault of a child and admitted to having sex with T.D. on multiple occasions.

In January 2013, a grand jury indicted Pixley for three separate charges of sexual assault. In October 2014, she waived her right to a jury trial and entered a plea of no contest in each of the three cases. The trial court ordered a presentence investigation report ("PSI") and reset the matter for hearing on punishment for November 2014. *See* Tex. Code Crim. Proc. Ann. arts. 42A.252–.253 (West 2017).[2] A community supervision officer prepared the PSI and filed it with the court on October 31, 2014. The trial court then rescheduled the punishment hearing a number of times over the following year as a result of Pixley's various claims of medical issues, and ultimately made a finding on the record that Pixley was "voluntarily absenting herself" from the proceedings and ordered that she be arrested and remain in custody pending the punishment hearing.

---

[2] Effective January 1, 2017, article 42.12 of the Texas Code of Criminal Procedure was re-codified, without substantive change, as chapter 42A of the Texas Code of Criminal Procedure. *See* Act of May 26, 2015, 84th Leg., R.S., ch. 770, §§ 1.01, 3.01, 4.01, 4.02, 2015 Tex. Gen. Laws 2320. We cite herein to the current version of the relevant statutory provision, which at all times pertinent to Pixley's case was contained in article 42.12, § 9(a).

Before the punishment hearing, the State filed a notice that it intended to offer evidence at trial of extraneous offenses or bad acts. *See* Tex. R. Evid. 404(b); Tex. Code Crim. Proc. Ann. arts. 37.07, 38.37 (West Supp. 2016). Specifically, the State's notice provided that it intended to introduce evidence that Pixley had "committed the offenses of Injury to a Child and Endangering a Child against victim [K.P.]"[3]

## II. The Punishment Hearing

The punishment hearing was ultimately held on December 18, 2015. The State's first witness was Jennifer Ross, the medical examiner that conducted an autopsy on K.P.'s body. Dr. Ross detailed the extensive injuries she found on K.P. during the autopsy, which included twenty-five "blunt force injuries to the head and face," some of which had a pattern like a foreign object struck against the head, three bruises on the neck, seven bruises and scratches on the chest and abdomen, eleven bruises on the back, and twenty-seven bruises on the arms and legs. She testified that while some of the bruises did appear to be "of older age," evidencing chronic abuse, most of the bruises "appeared acute, or occurring just prior to death." She also

---

[3] Pixley's appellate brief indicates that there was a pre-trial hearing held on the admissibility of the uncharged extraneous offense, and the State's opening statement at the punishment hearing lends support to that assertion; however, there is no transcript of that hearing, nor does the record contain any docket entry or other record concerning the hearing, the arguments of the parties, or the trial court's findings.

described a skull fracture that K.P. had sustained and explained that it requires a lot of intentional force to fracture a skull. Finally, she testified that she found injuries to K.P.'s brain and diffuse, bilateral hemorrhages in the back of both of her eyes, caused not from the strike to the head, but from "a repeated shaking episode." With regard to the timing of K.P.'s brain and retinal injuries in relation to her death, Dr. Ross testified that:

> [w]henever a child sustains a shaking injury especially, and her findings are consistent with shaking, it is -- they immediately become unresponsive after the event. There's no time period of – there's no interval between injury and unresponsiveness. There may be an episode of vomiting, but nothing more than usually. So it occurred slightly before calling 9-1-1.

Dr. Ross concluded, as confirmed in the autopsy report that was admitted into evidence, that the cause of K.P.'s death was blunt head trauma with skull fracture and subdural hemorrhage, and the manner of her death was homicide.

The State next presented evidence from Drs. Fletcher and Strobel, two of the surgeons involved with K.P.'s care on the night she died, both of whom testified regarding the extent and severity of the child's injuries preceding her death. Dr. Fletcher testified that K.P.'s fatal injuries were in all probability the result of child abuse. This conclusion was also documented in medical reports that were admitted, with diagnoses including "multiple trauma due to child abuse" and history that

5

included "[patient] clearly beaten with bruises about face, bite marks and what appears to be a hit in head on right frontal area with a blunt object like a stick . . . ."

Travis Nichols, Pixley's live-in boyfriend in 2010, was called to testify about his recollection of the events leading up to K.P.'s death. Nichols testified that he worked on the day that K.P. died, but that he was with Pixley and the children before he left for work, on his lunch break, and then that evening, after work. His testimony indicates that K.P. was in Pixley's physical custody and care the entire day before she arrived at the hospital. This was consistent with the testimony of Shawna Kurth, a DFPS investigator who interviewed Pixley while K.P. was at the hospital in Livingston. Kurth testified that in the interview, Pixley told her that both children had been solely in her care during the 24-hour period before K.P. was brought to the hospital and that Nichols, specifically, had never been left alone with the children. It was also consistent with the testimony of the detective that investigated K.P.'s death, that after a thorough investigation of the child's whereabouts throughout the day of her death, he could find no person who was with the child or had access to the child to inflict any type of injury to her, other than Pixley. The State also presented a witness who had seen Pixley in a store with the two girls several hours before K.P was brought to the hospital. The witness testified that at that time, both children appeared healthy and with no obvious signs of problems.

Finally, the State called the community supervision officer that prepared the PSI. During the PSI interview, Pixley told the officer that she had a history with the prosecutor and investigator handling her sexual assault cases as a result of her having been investigated and seen as responsible for K.P.'s death. That information was included in the PSI filed with the court.[4] The officer testified that Pixley did not go into the details of K.P.'s death with her; however, Pixley did acknowledge to her that K.P. died from a head injury, and Pixley never denied causing that injury, nor did she suggest that any other person had caused the injury.

At the conclusion of the punishment hearing, the trial court presented its findings and rulings:

> I've heard the evidence presented today. I've read the presentence investigation; and in view of such, I assess your punishment for each charge at 20 years and a fine of $10,000 and court costs and that each of your punishments should be stacked and not concurrent.

The trial court certified Pixley's right to appeal as to punishment only, and Pixley filed a timely notice of appeal.

---

[4] Although the report was not formally admitted into evidence, it was referred to throughout the hearing by attorneys for both the State and Pixley.

7

### III.  Extraneous Offense Evidence

In her first issue, Pixley complains that the trial court erred in admitting evidence of an uncharged, unindicted, extraneous offense in the punishment phase, because the State did not and could not prove beyond a reasonable doubt that Appellant committed the offense. We review a trial court's decision to admit evidence of an extraneous offense or bad act in the punishment phase of a proceeding for abuse of discretion. *Thompson v. State,* 425 S.W.3d 480, 490 (Tex. App.—Houston [1st Dist.] 2012, pet. ref'd); *see also Malpica v. State,* 108 S.W.3d 374, 378–79 (Tex. App.—Tyler 2003, pet. ref'd) ("[T]he only review possible of the sufficiency of the proof of an extraneous offense introduced at the punishment stage is a review under an abuse of discretion standard of the trial judge's threshold ruling on admissibility."). "Under an abuse of discretion standard, an appellate court should not disturb the trial court's decision if the ruling was within the zone of reasonable disagreement." *Bigon v. State,* 252 S.W.3d 360, 367 (Tex. Crim. App. 2008). The test for evidentiary relevance is much broader in the punishment phase of a trial than the guilt-innocence phase, "the purpose being to allow the factfinder as much useful information as possible in deciding the appropriate punishment for the individual defendant." *Bowser v. State,* 816 S.W.2d 518, 521 (Tex. App.—Corpus Christi 1991, no pet.).

Article 37.07 of the Code of Criminal Procedure grants a trial court broad discretion to admit evidence of extraneous crimes or bad acts during the punishment phase of a proceeding. In relevant part, that statute provides that

> evidence may be offered by the state and the defendant as to any matter the court deems relevant to sentencing, including but not limited to the prior criminal record of the defendant, his general reputation, his character, an opinion regarding his character, the circumstances of the offense for which he is being tried, and, notwithstanding Rules 404 and 405, Texas Rules of Evidence, any other evidence of an extraneous crime or bad act that is shown beyond a reasonable doubt by evidence to have been committed by the defendant or for which he could be held criminally responsible, regardless of whether he has previously been charged with or finally convicted of the crime or act.

Tex. Code Crim. Proc. Ann. art. 37.07, § 3(a)(1). Additionally, because section 3(d) of article 37.07 places no conditions on a trial court's ability to consider the contents of a PSI, the Court of Criminal Appeals has held that a trial court may consider extraneous misconduct contained in a PSI even if the offenses are not established beyond a reasonable doubt to have been committed by the defendant, as long as there is some evidence from which it could be rationally inferred that the defendant had some criminal responsibility for the extraneous misconduct. *See Smith v. State*, 227 S.W.3d 753, 758–59, 763–64 (Tex. Crim. App. 2007).

In support of her argument that the State failed to meet its burden in this case, Pixley relies heavily on the opinion of the Fourteenth Court of Appeals in *Smith v.*

9

*State*, 292 S.W.3d 36 (Tex. App.—Houston [14th Dist.] 2006), *aff'd on other grounds*, 227 S.W.3d 753 (Tex. Crim. App. 2007). We find her reliance on that opinion to be misplaced, as the Court of Criminal Appeals remanded that case to the trial court "for reasons entirely different than" those set out by the appellate court. *Smith*, 227 S.W.3d at 764. Further, the underlying facts are wholly distinguishable. In *Smith*, the evidence presented in the PSI and at the punishment hearing indicated that the child victim had sustained a myriad of injuries over the course of several weeks and fatal injuries that were believed to have been sustained "during a range of six to twelve hours prior to arrival at the hospital; however, the range could have been much longer or shorter[.]" *Smith*, 227 S.W.3d at 755–57. Further, the State's sole witness at the punishment hearing was unable to say whether the defendant had been in "exclusive possession" of the child at any time during the period when most of the child's injuries occurred. *Id*. at 756. Based on that evidence, the Court of Criminal Appeals found that, in assessing the defendant's punishment for the specific injury that he pled guilty to causing, the blow that caused the child's death, the trial court could not consider whether the defendant had actually *caused* any of the child's other injuries. *Id*. at 764. However, it held that the trial court was "free to consider any reasonably available inference" that he knew about and failed to

respond to the other injuries, "regardless of whether the PSI establish[ed] his knowledge to a level of confidence beyond a reasonable doubt." *Id.*

Those facts stand in stark contrast to the record before this court. In the cases before us, evidence that K.P. died from a head injury while she was under Pixley's supervision and that Pixley was "seen as responsible for her death" were among the contents of the PSI. Thus, as in *Smith*, evidence concerning the circumstances of K.P.'s death, and particularly the reasons that Pixley was seen as responsible for that death, though uncharged and unadjudicated, could nevertheless be taken into consideration by the trial court in assessing punishment. *See id.* at 762–63; Tex. Code Crim. Proc. Ann. art. 37.07, § 3(a), (d). Unlike in *Smith*, however, the State in these cases did not rely solely on the PSI; it developed the evidence of extraneous misconduct through extensive testimony at the punishment hearing. Beyond the PSI itself, the State presented evidence, primarily without objection, detailing not only the multitude of injuries inflicted upon K.P., but also a general timeline of the day of her death. Collectively, the evidence indicates that (1) K.P was seen with Pixley and appeared normal and without significant injury in the hours before her death, (2) most of K.P.'s injuries, including the fatal ones, were inflicted shortly before her death, and (3) Pixley was in primary, if not exclusive, possession of the child for the time period during which those acute injuries were sustained. We find that this

11

evidence and reasonable inferences drawn therefrom are sufficient for the trial court to have found to a level of confidence beyond a reasonable doubt that Pixley either caused K.P.'s injuries or that she could otherwise be held criminally responsible for them. *See Smith*, 227 S.W.3 at 764; Tex. Code Crim. Proc. Ann. art. 37.07(a)(1). Therefore, we hold that the trial court did not abuse its discretion by considering evidence concerning Pixley's role in or responsibility for K.P.'s injuries or death in assessing the punishment appropriate for her cases of sexual assault of another child. We overrule Pixley's first issue.

## IV.   Improper Argument by the State

In her second issue, Pixley argues that the State engaged in prosecutorial misconduct by engaging in improper argument during the closing argument and by attempting to testify or introduce evidence outside of the record. Specifically, Pixley complains that the State engaged in three improper arguments.

### A. *State's Decision Not to Prosecute Pixley for KP death*

The first argument about which Pixley complains concerns the fact that the State never presented charges against Pixley to a grand jury in relation to K.P.'s death. Pixley argues that it was improper for the prosecutor to argue why he did or did not take particular actions with regard to that case because the prosecutor himself did not testify.

12

There are four areas of proper argument: (1) summation of the evidence, (2) reasonable deductions from the evidence, (3) answers to the argument of opposing counsel, and (4) pleas for law enforcement. *See Cifuentes v. State,* 983 S.W.2d 891, 895 (Tex. App.—Houston [1st Dist.] 1999, pet. ref'd). In its closing argument, the State explained that there was no practical purpose in the State pursuing murder charges against Pixley for K.P.'s death when the potential punishment she faced for multiple sexual assault charges would have the same practical result —a sentence that "is tantamount to a life sentence under Texas law." In doing so, the State was summarizing and arguing deductions from testimony that had been presented through the investigator, without substantive objection, that the investigation of K.P.'s death took "a kind of a turn in a different direction with the establishment of these sexual assault charges," and that the strength of the evidence on the sexual assault charges impacted the case involving K.P.'s death "in a tactical way" that was discussed with the prosecutor during the investigation. The summation was the logical extension and reasonable inference of the investigator's testimony that, with Pixley having admitted to very serious charges in the sexual assault cases, it would be unnecessary from a tactical perspective to pursue additional charges relating to the child's death. *See Gaddis v. State,* 753 S.W.2d 396, 400 (Tex. Crim. App. 1988) ("The purpose of closing argument is to assimilate the evidence to assist the fact-

13

finder in drawing proper conclusions from the evidence."). Additionally, the State's explanation answered the argument of opposing counsel that the reason the State did not pursue charges against Pixley for K.P.'s death was that the investigator did not believe he had probable cause to charge her. Accordingly, the State's remarks were within the scope of permissible argument. *See Sandoval v. State,* 52 S.W.3d 851, 858 (Tex. App.—Houston [1st Dist.] 2001, pet. ref'd) (holding that if the defense invites argument, it is appropriate for the State to respond).

## B. *Effect of Sexual Assault on Victim*

The second area of closing argument that Pixley asserts was improper was the State's suggestion that her sexual assaults against T.D. had any adverse effect on that child. Although Pixley asserts on appeal that the State's improper argument was that "the victim in the instant case has been traumatized by the sexual assaults," no such statement by the State appears in the record. Rather, the State responded to Pixley's implications throughout the hearing that the child was not traumatized or was only "[l]egally . . . a victim" with an accurate recitation of the evidence concerning T.D.'s circumstances following the assaults, including his own "criminal problems" and concluding that "I don't think you can sit here and say that definitively what she did to him had no impact on this boy whatsoever." Moreover, Pixley did not object at any point to the State's argument in this regard. We therefore

14

conclude that Pixley failed to preserve her complaint for appeal even if the argument had been improper. *See* Tex. R. App. P. 33.1(a); *Archie v. State,* 221 S.W.3d 695, 699 (Tex. Crim. App. 2007); *Temple v. State,* 342 S.W.3d 572, 603 (Tex. App.— Houston [14th Dist.] 2010), *aff'd*, 390 S.W.3d 341 (Tex. Crim. App. 2013).

## C. *Pixley's Subsequent Pregnancies*

The third area of argument about which Pixley complains on appeal deals with the State's mention of Pixley having had one child and becoming pregnant with another while on bond after having pled to the charges in this case, which Pixley characterizes on appeal as the State suggesting that Pixley should be punished for having become pregnant or suggesting that Pixley only became pregnant as a ploy to obtain sympathy from the court. However, Pixley's complaints on appeal do not comport with the objection presented to the trial court at the time of the argument. Specifically, Pixley made no objection when the State questioned whether Pixley acted in a "responsible" manner when she had multiple children while awaiting punishment for serious crimes. Pixley's only objection came when the State alluded to the question of who would care for her children while she was incarcerated: "To argue that there's going to have to be a welfare baby out there, there['s] no evidence in this case about of [sic] that; and that's improper." After the court indicated understanding of the issue of who would care for the children if she were

15

incarcerated and the State continued with its closing, Pixley raised no objection to the State's comment that the pregnancies might have been for sympathy, nor did she object when the State ultimately characterized her as an "evil person." Therefore, we find that Pixley failed to preserve her complaints. *See Pena v. State,* 285 S.W.3d 459, 464 (Tex. Crim. App. 2009) ("Whether a party's particular complaint is preserved depends on whether the complaint on appeal comports with the complaint made at trial.").

A complaint must generally be properly preserved before it can be presented on appeal. Tex. R. App. P. 33.1. Pixley concedes that some of the arguments or statements she now complains of were not objected to at trial; nonetheless, she argues that "the use of the inflammatory [and] impermissible arguments was so pervasive that the error became structural error that did not need preservation." We disagree. Appellant has not cited, nor are we aware of, any authority supporting the notion that any degree of pervasiveness can transform discrete instances of allegedly improper prosecutorial argument into structural error that would excuse compliance with the Rules of Appellate Procedure. *See Mendez v. State*, 138 S.W.3d 334, 342 (Tex. Crim. App. 2004) ("Except for complaints involving systemic (or absolute) requirements, or rights that are waivable only, . . . all other complaints, whether constitutional, statutory, or otherwise, are forfeited by failure to comply with Rule

16

33.1(a)."). We therefore overrule Pixley's second issue and affirm the trial court's judgments in all three cases.

AFFIRMED.

_____
CHARLES KREGER
Justice

Submitted on June 13, 2017
Opinion Delivered September 20, 2017
Do Not Publish

Before Kreger, Horton, and Johnson, JJ.

17